Chadwick, Appellant, *v.* Popadick.

Argued March 21, 1960. Before JONES, C. J., MUS-MANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Joseph J. Malizia,* for appellants.

*John D. Gresimer,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 18, 1960:
The litigation involved in this appeal was before us in 390 Pa. 511, so that it is unnecessary to again narrate the facts which brought about the accident underlying the legal controversies involved. It is enough to say that three cars, being operated respectively, by Mi-

chael Popadick, Harold Chadwick, and Francis Simones, participated in the accident. The cars were traveling Indian file. Popadick, heading the file, suddenly stopped; Chadwick, immediately following, then stopped; and Simones, who was following Chadwick, ploughed into Chadwick, and Chadwick struck Popadick with the result that Chadwick left the road and plunged over an embankment.

Chadwick sued Popadick and Simones; Simones sued Chadwick; and Frank Grimone, who was a passenger in Chadwick's car, sued Popadick, Simones and Chadwick.

At the first trial, the court directed a verdict in favor of Popadick and we reversed, ordering a new trial. At the second trial the jury returned a verdict in favor of the defendant Popadick and against the defendant Simones, with whom the plaintiffs had already made settlement.

The plaintiffs have now asked for another trial.

It is Chadwick's contention that the accident would never have occurred if Popadick had not suddenly stopped in his tracks without giving the following cars adequate warning. Popadick, on the other hand, maintains that he had to stop because two deer were in the roadway ahead of him and he thus claims immunity from liability for the ensuing collisions on the basis that he was confronted with an emergency.

Chadwick submits that there was no emergency because the deer which stopped Popadick's car were not ahead of him but in the fields adjoining the road. He testified: "Well, as I came around the curve below Sterling Run and was able to see the straight stretch ahead of me, I noticed two deer crossing the highway ahead of us and just after they crossed the highway and *went down over the bank,* Mr. Popadick passed me and went a short distance and Mr. Popadick came to a stop and when I saw his stop light coming on, I applied my

brakes but before I could get stopped, I was hit from behind by Mr. Simones' car and driven into the back of Mr. Popadick's car. Now when Mr. Simones hit me I tried to turn the wheels to the left to avoid hitting him and I hit the left rear corner of his car. I went . . . over the bank where I came to rest." (Emphasis supplied.)

Frank Grimone, who was a passenger in Chadwick's car, testified: "Well, after we came around the curve at Sinnemahoning, I was glancing out my window to my right and I happened to notice that a car was starting to pass us from the left and that was Mr. Popadick. I casually glanced . . . out the window and as I was looking toward my right *off to the edge of the road I happened to notice two deer standing there.*" (Emphasis supplied.)

Popadick assumed that the two deer were mother and offspring. He said that the "mother deer" was on the berm of the road, but that the "young deer" remained on the road "romping around." Thus, a question of fact arose as to whether the fawn remained on the road "jumping around and frolicking or gamboling there," as the trial judge described it, or whether both deer were off the highway.

Popadick testified that when he first saw the deer they were from 250 to 275 feet ahead of him. Was this enough distance within which he could notify the motorists in his wake that he intended to stop and thus avert the telescoping of cars behind him? Popadick said that he saw the deer for about a minute and a half before he gave warning to the following cars: "Q. How many seconds would you say you looked at the deer? A. I kept watching the deer ever since I first saw them when I began giving them the signal or possibly just before that. Q. Could you say how many seconds that was? A. Oh, it possibly may have been a minute and a half, around that vicinity. Q. You were watching the

deer for about a minute and a half, that's your best estimate? A. Yes, because they were right in front of me, however long it took me to where I had stopped, that's how long I was watching them."

Could Popadick claim protection under the sudden emergency rule on this state of facts? In any event, he would have to establish the alleged emergency by a preponderance of the evidence. In *Mashinsky et al. v. Philadelphia*, 333 Pa. 97, we said: "The burden is on the party who pleads the existence of an emergency to justify his violation of 'the rules of the road.'"

The learned trial judge in the court below inadvertently overlooked this rule. He stated several times that the plaintiff had the burden of proving negligence, but he did not specify that, given the nature of the defense in this case, the defendant also had a burden to carry. The failure to enlighten the jury on the responsibility of the defendant in these particular circumstances, and the judge's emphasizing the onus resting on the plaintiff to prove his case could possibly have led and probably did lead the jury into assuming that it was up to the plaintiff to prove that an emergency did *not* exist.

The trial judge did not instruct the jury that if the evidence established that Popadick was negligent and that the emergency advanced by him arose out of his own failure to exercise due care in the operation of his vehicle, he could not then be excused from liability because of such emergency. This kind of a situation was illustrated in the case of *Schu et ux. v. Pittsburgh*, 143 Pa. Superior Ct. 101, 105, where the Superior Court said: "The appellant contends that the accident was unavoidable; that its driver was confronted with a sudden emergency when the motorcycle appeared; and that the situation that confronted him required only the exercise of his best judgment under the circumstances: Mulheirn v. Brown et al., 322 Pa. 171, 185 A. 304. *This*

*rule does not apply, however, where, as here, the defendant's conduct brought about or created the sudden emergency*: Casey v. Siciliano, 310 Pa. 238, 241, 165 A. 1 and cases cited." (Emphasis supplied.)

In *Smith v. Gross*, 113 Pa. Superior Ct. 568, we find another such case: "Here the driver created and was responsible for the emergency when he attempted to pass and came up abreast of the other car on a descending grade on a wet, oily road with another car approaching. *When one by his own negligence creates an emergency, he is not excused by reason of the fact that he is in an emergency and has not time to act as he otherwise would do.*" (Emphasis supplied.)

And more recently, in *Levine v. Mervis*, 373 Pa. 99, at 102, this Court said: " 'We have frequently stated that the sudden emergency rule will not apply if the emergency arises through the prior negligence of him who seeks the protection of the rule. . . . When the driver of an automobile claims that he has been subjected to a sudden emergency in driving on the highways, to enable him to claim the benefit of this rule, it must appear that he was not driving in a reckless or careless manner, but with due regard to the condition of the highway and the traffic. One driving carelessly cannot say that he was placed in sudden peril. If driving in a careful manner, the peril would not have arisen. The question, therefore, is usually one for the jury to determine, *under proper instruction*.' Casey v. Siciliano, 310 Pa. 238, 241, 242, 165 A. 1." (Emphasis supplied.)

The evidence in this case called upon the trial judge to tell the jury that if the emergency contended for by Popadick was of his own making, it could not be used as a valid defense. Popadick's own testimony was that he first saw the deer some 250 feet ahead, that he thereupon "touched" his brakes, four, five or six times while traveling 30 or 40 feet without slowing down,

and that he traveled 60 feet before slowing down to 10 to 12 miles an hour. His explanation for not applying his brakes or starting to slow down was that when he first saw the deer he was traveling 40 to 50 miles an hour and that he "thought they were going across." In all these circumstances, a charge on when the sudden emergency rule may be invoked was imperative. Unfortunately it was here overlooked.

The charge became rather complicated by the submission of counsel of 29 points for charge, plus four requests for special findings of fact, so that in the aggregate when delivered, the charge, we fear, took the jury into a cavern of darkness in which they had to grope for the exit, with no assurance that the exit was the one which led to a proper solution of the case. The closest that the trial court came to charging on the indispensable instruction about the responsibility of the defendant on the sudden emergency doctrine is to be found in the following language: "Now another matter, the negligence of the defendant in order that he may be found guilty or found liable must be the proximate cause of the accident. Now the proximate cause of any event is that which in the natural and continuous sequence, unbroken by any new independent cause, produces the event and without which that event and the damages or injury would not have occurred. In determining what is the proximate cause, the rule is that the damage or injury must be the natural and probable consequence of the negligence, such consequences as under the surrounding circumstances of the case might not have been foreseen by the wrongdoer or defendant as likely to follow from his act. If the defendant has committed a breach of duty or negligence or lawfully put into operation a force likely to injure others, he is liable for its natural and proximate effects which may be immediate and direct or through the media of natural force or other innocent causes or conditions."

If this portion of the charge had been delivered in Greek instead of English, it could hardly have been any more enigmatic and mystifying to the jury. The trial court here was probably endeavoring to make its charge airtight and waterproof against the possibility of an appeal, but we would like to point out that the purpose of a charge is to enlighten the jury on their duties and responsibilities and not to assure an appellate court that the judge has met his responsibilities. When judges charge with an eye on the appellate court instead of the jury, they are apt to miss the jury as well as the appellate court.

Another inadvertence must be pointed out. The trial judge said: "If Mr. Simones became aware of the dangerous situation ahead and did nothing to stop but continued negligently on knowing that the situation was ahead of him, then he alone would be liable." This is not the law. If Popadick created the dangerous situation, he would be liable with Simones for the resulting accident.

What followed in the court's charge did not cure the error. The court attempted to explain the modification by saying: "However, if he did not learn of this dangerous situation until after his own negligence caused the accident, then both Mr. Popadick and Mr. Simones would be jointly liable."

The court then said: "I hope I have explained that distinction so that you understand it." We wish we could be as sure of the fulfillment of the hope as the sincerity with which it was uttered.

In view of the need for a new trial for the reasons stated, it is unnecessary to dwell on the other errors alleged by the plaintiffs, except to point out that we deem it inadvisable to permit allegations of plaintiffs' complaint as to Simones' negligence (which allegations are deemed denied under our Rules of Civil Procedure) to be used as proof of Simones' negligence,

nor to permit the same result to be accomplished under the guise of testing plaintiffs' credibility by inconsistent statements in the complaint.

Judgments reversed with a venire facias de novo.