**Bih-Jing JENG et al., Plaintiffs,**

v.

**Joseph E. WITTERS and General Motors Corp., Defendants,**

v.

**Ying-Che CHENG, Additional Defendant.**

**Civ. A. No. 70–421.**

United States District Court,
M. D. Pennsylvania.

June 26, 1978.

---

1. The discharge was granted to both husband and wife on Feb. 5, 1976.

Hepford, Zimmerman & Swartz, Harrisburg, Pa., Keith Erbstein, Beasley, Albert, Hewson, Casey, Kraft & Colleran, Philadelphia, Pa., for plaintiffs.

George P. Williams, III, of Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Wilhelm E. Shissler, Nauman, Smith, Shissler & Hall, Harrisburg, Pa., for defendant General Motors.

Metzger, Wickersham, Knauss & Erb, Harrisburg, Pa., for Joseph E. Witters.

F. Lee Shipman, of Goldberg, Evans & Katzman, Harrisburg, Pa., for Ying-Che Cheng.

## OPINION

HERMAN, District Judge.

Bih Jing Jeng, on his own behalf, and in his capacity as administrator of the estate of his deceased wife, Su-Jen Jeng, brought this diversity suit to recover damages for injuries he sustained, and for the death of his wife, resulting from a motor vehicle collision which occurred around 9:30 p. m. on August 23, 1969.

Bih Jing Jeng and his wife, hereinafter referred to as Plaintiffs, were passengers in the rear seat of a 1963 Buick Wildcat four-door hardtop sedan owned and operated by one Ying-Che Cheng. The Buick was involved in a collision with a 1966 Ford Thunderbird operated by Joseph E. Witters. Plaintiffs sued Witters, claiming that Witters had been negligent in the operation of the Thunderbird, and Plaintiffs also sued General Motors, claiming liability under Section 402A of the Restatement (Second) of Torts for a defective door latch which allegedly caused a "second collision" type accident during the collision with the Witters' vehicle when a rear door of the Jeng vehicle flew open and both Plaintiffs were thrown to the highway. General Motors and Witters asserted third party claims against the driver of Plaintiffs' vehicle, Ying-Che Cheng, and General Motors and Witters also asserted claims against each other. A jury returned a verdict for the Defendants, and the case is now before us on motions by Plaintiffs for judgment n. o. v. or a new trial.

The accident occurred at the intersection of U.S. Route 15 and Pennsylvania Route 114 in Upper Allen Township, Cumberland County, Pennsylvania. Route 15 is a four-lane concrete highway divided by a medial strip. The road runs generally north and south. Route 114 is a two-lane macadam road running generally east and west. At the time of the accident there was no traffic light at the intersection of Route 15 and Route 114, but Route 114 was controlled by stop signs. The night of the accident was dark, the weather was clear, and the roads were dry.

The Cheng Buick was in the process of crossing Route 15 on Route 114 from east to west when it was struck in the right rear

**1354**

fender, just behind the right rear wheel, by the right front headlight and fender area of the Witters' Thunderbird. Immediately prior to the accident, the Witters' vehicle was proceeding south in the righthand, or westernmost, lane of Route 15. Testimony at trial indicated that Defendant Witters was traveling at approximately 60 miles per hour when he applied his brakes just before the collision. (N.T. 765). The force of the collision spun the Buick in a clockwise direction, damaged the structure of the vehicle, bent the frame, and caused the right rear door opening to enlarge. (N.T. 277, 281).

A jury trial was held in March of 1975 before the late Judge Michael Sheridan, then chief judge of the United States District Court for the Middle District of Pennsylvania. In response to special interrogatories, the jury found that Defendant Witters was not negligent in the operation of his automobile and that the 1963 Buick door latch was not defective and unreasonably dangerous at the time of the accident. (N.T. 1545). Plaintiffs have moved for judgment n. o. v. and for a new trial pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure, against both Witters and General Motors, alleging some fourteen different grounds including alleged evidentiary errors and alleged errors in the judge's charge to the jury. Five of the points raised deal with the liability of Defendant Witters, and nine of the points concern the liability of Defendant General Motors.

The pending post trial motions were assigned to us pursuant to Rule 63 of the Federal Rules of Civil Procedure after the untimely death of Judge Sheridan. Having reviewed the trial transcript and relevant file documents, and after hearing oral argument, we are now in a position to rule on the pending motions.

## THE CASE AGAINST GENERAL MOTORS

*Sufficiency of the evidence.*

In answers to special interrogatories, the jury found that the right rear door latch in the Buick automobile was not defective and unreasonably dangerous at the time of the accident, thus finding in favor of General Motors on the products liability claim. Plaintiffs have alleged nine trial errors in the manufacturer's portion of the case. Defendant General Motors argues that any trial errors are purely academic because there was insufficient evidence to submit the strict liability issue of a defect in design to the jury. From a careful review of the record, we are satisfied that there was not sufficient evidence to permit a jury to decide whether the door latch mechanism had a defect in design.

 Pennsylvania has adopted the doctrine of strict liability in tort as expressed in the Restatement (Second) of Torts, § 402A.[1] *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). A manufacturer may be held liable if it manufactured a product in such a manner that it was in a defective condition and unreasonably dangerous and the defect caused injuries, regardless of the degree of care exercised by the manufacturer.[2] The design of a product may make

---

1. Section 402A provides:

 "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if
 (a) the seller is engaged in the business of selling such a product and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold
 (2) The rule in subsection (1) applies although

 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer had not bought the product from or entered into any contractual relation with the seller."

2. In *Cornell Drilling Co. v. Ford Motor Co.*, 241 Pa.Super. 129, 359 A.2d 822 (1976) the Pennsylvania Superior Court in discussing what is a defective product, cites comment (g) of § 402A to the effect that a defective condition exists when "the product is at the time it leaves the seller's hands in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him". The Court also

it defective and unreasonably dangerous. *Bowman v. General Motors Corp.,* 427 F.Supp. 234 (E.D.Pa.1977).

▮ In the instant case the issues revolve around a "second collision" and the crashworthiness of the design of a door latch on a 1963 Buick. Crashworthiness means the protection that a passenger motor vehicle affords its passengers against personal injury or death as a result of a motor vehicle accident. See, 15 U.S.C. § 1901(14). The term "second collision", as used in definitions of crashworthiness of a motor vehicle in products liability cases generally refers to the collision of the passenger with the interior part of the automobile after the initial impact or collision. *Dreisonstok v. Volkswagenwerk, A. G.,* 489 F.2d 1066 (4th Cir. 1974). In the type of case where a car door opens allowing an occupant to not be retained within a motor vehicle in a collision, we believe the "second collision" concept is still applicable, although in such a situation the person has not collided with the interior of the vehicle. The principle behind the "second collision" concept is that because of the way the vehicle has been manufactured a passenger's injuries have been aggravated unnecessarily, and such a concept has equal applicability whether the person's second collision is with the interior of the vehicle or, as in this case, the highway.

▮ There has been some controversy over whether a manufacturer should be held liable for a second collision type accident, mainly because some courts have not regarded an automobile accident as a contemplated use of the manufacturer's product. There have been no authoritative Pennsylvania cases adopting or rejecting the concept, and so we must determine how we believe the Pennsylvania courts would react when faced with the question. In *Dyson v. General Motors Corp.,* 298 F.Supp. 1064 (E.D.Pa.1969), the Court determined that Pennsylvania would follow the second collision approach outlined in *Larsen v. General Motors Corp.,* 391 F.2d 495 (8th Cir.

1968) rather than that of *Evans v. General Motors Corp.,* 359 F.2d 822 (7th Cir. 1966). See generally, Comment, "Automobile Crashworthiness, EVANS Takes a Backseat", 21 Vill.L.Rev. 72 (1975-76). We agree.

It was stated in *Larsen* that:

"The manufacturer should not be heard to say that it does not intend its product to be involved in any accident when it can easily foresee and when it knows that the probability over the life of its product is high, that it will be involved in some type of injury-producing accident. . . . We perceive no sound reason either in logic or experience nor any command in precedent why the manufacturer should not be held to a reasonable duty of care in the design of its vehicle consonant with the state of the art of minimizing the effect of accidents."

*Larsen v. General Motors Corp., supra,* at 502–503.

▮ Strict liability in tort requires that the product be used in a foreseeable manner, and the *Larsen* approach concludes that an accident is a foreseeable use of an automobile. That is not to say a manufacturer has a duty to design a car to withstand *all* collisions under *any* and *all circumstances,* but rather that passengers must be provided with a reasonably safe container within which to make a journey. *Dyson v. General Motors Corp.,* 298 F.Supp. 1064 (E.D.Pa.1969). A jury should take into account the circumstances of the accident in which the car is involved, and where a door latch fails to hold under the stress of an accident, a major consideration must be the severity of the physical forces which were placed on the car as a whole and the door latch in particular. As outlined in *Polk v. Ford Motor Co.,* 529 F.2d 259 (8th Cir. 1976), a manufacturer may be held liable for only those injuries shown to have been caused or enhanced by a defective condition of a product in the course of or following an initial accident brought about by some independent cause.

cited Dean Prosser who noted that '[T]he prevailing interpretation of defective is that the product does not meet the reasonable expecta-

tions of the ordinary consumer as to its safety". W. Prosser, Law of Torts, 659 (4th ed. 1971) (footnote omitted).

One of the fundamental questions touching on many aspects of proof in this products liability case is whether the unreasonably dangerous requirement contained in § 402A of the Restatement (Second) of Torts, is the law of Pennsylvania. This problem arises because of the opinion of Chief Justice Jones of the Pennsylvania Supreme Court in *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975), which asserted that a plaintiff in a § 402A case need not prove that a product is unreasonably dangerous. The later Pennsylvania cases are not conclusive, and the federal courts have consistently held that *Berkebile* fails to state the law of Pennsylvania because it was concurred in by only one other justice.[3] *Greiner v. Volkswagenwerk Aktiengesellschaft*, 540 F.2d 85 (3d Cir. 1976); *Postape Associates v. Eastman Kodak Co.*, 537 F.2d 751 (3d Cir. 1976); *Bair v. American Motors Corp.*, 535 F.2d 249 (3d Cir. 1976); *Bowman v. General Motors Corp.*, 427 F.Supp. 234 (E.D.Pa. 1977); *Serpiello v. Yoder Co.*, 418 F.Supp. 70 (E.D.Pa.1976); *Bunn v. Caterpillar Tractor Co.*, 415 F.Supp. 286 (W.D.Pa.1976); *Beron v. Kramer-Trenton Company*, 402 F.Supp. 1268 (E.D.Pa.1975); See, Note, "Pennsylvania Supreme Court Rejection of 'Unreasonably Dangerous' Standard of Section 402A, Restatement of Torts, Held Deficient as Binding Precedent", 81 Dick.L.Rev. 374 (1977).

■ It was pointed out in *Bowman v. General Motors Corp.*, 427 F.Supp. 234 (E.D. Pa.1977), the unreasonably dangerous requirement serves a valuable function as a measure or standard in design defect cases, because often there has been a conscious trade-off among safety, utility and cost. Included in the factors mentioned in *Bowman* which are to be considered in determining whether a product is unreasonably dangerous are the likelihood that the product as designed will result in injury to a user, the seriousness of potential injury in such circumstances, the ability of the manufacturer to eliminate unsafe characteristics without impairing the usefulness of the car or significantly increasing its cost, and whether the product is dangerous beyond that which would be contemplated or expected by the ordinary user, considering the ordinary knowledge common to the community as to an automobile's characteristics.[4]

We believe the trial court properly used the unreasonably dangerous concept in this case and therefore we rule against Plaintiffs' assignment of error on this point.

As we stated previously, General Motors argues that there was not sufficient proof by Plaintiff to submit this case to the jury. Generally expert testimony is used to prove a defect, and the need for expert testimony would seem to be especially helpful where the claim is a defect in design rather than manufacture. *See, Bair v. American Motors Corp.*, 473 F.2d 740 (3d Cir. 1973); *Fenton v. McCrory*, 47 F.R.D. 260 (W.D.Pa. 1969). However, it was recognized in *MacDougall v. Ford Motor Co.*, 214 Pa.Super. 384, 257 A.2d 676 (1964), that under some

---

**3.** In *Lenkewicz v. Lange*, 242 Pa.Super. 87, 363 A.2d 1172 (1976), *Berkebile* was cited by the Pennsylvania Superior Court for the proposition that a plaintiff must prove that the product was defective and not that it was unreasonably dangerous, however, in the more recent Pennsylvania Supreme Court case of *Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736 (1977), in holding that strict liability applies to lessors of products, the Pennsylvania Supreme Court cited Restatement (Second) of Torts, § 402A in its entirety as adopted in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). This is some indication that the unreasonably dangerous requirement is still part of strict liability in Pennsylvania.

**4.** The court in *Bowman* acknowledged that in formulating its balancing test it drew upon the works of Dean Wade. *See*, Wade, "On the Nature of Strict Tort Liability", 44 Miss.L.J. 825, 837–38 (1973). In the present case the court also instructed the jury as to a number of factors to be considered in determining whether the door latch was unreasonably dangerous, (NT. 1495–1496), including the usefulness and desirability of the product as designed, the availability of other and safer products at the time, the likelihood of injury and its probable seriousness, the obviousness of the danger, common knowledge and normal expectations of danger, the avoidability of injury by care in the use of the product, and whether it would be possible to eliminate the danger without seriously impairing the usefulness of the product of making it overly expensive.

circumstances evidence of the malfunction of a product can create a permissible inference that the product was defective. In *MacDougall* a new Ford automobile which had been driven at moderate speeds for less than 200 miles suddenly went out of control for no apparent reason and the Pennsylvania Superior Court ruled that in such a situation there was sufficient circumstantial evidence to permit a jury to infer that the steering mechanism of the car was defective in some manner.

Some mention was made in the record in this case (N.T. 571–572) of a *MacDougall* theory of liability although at other points the Plaintiffs indicated their proof would go a step beyond *MacDougall*. (N.T. 582). To rely on *MacDougall*, the Plaintiff would have to show that the door latch remains closed in normal use and for it to come open during normal use would be a malfunction evidencing a defect. We believe that reliance on a *MacDougall* theory of recovery would be misplaced in this case because it appears to be the external force of the accident which caused the door latch to break apart and allowed the door to open. *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914 (1974).

Plaintiffs wisely took their theory a step further and indicated that the specific defect was in design of the door and latch such that in an accident the latch motor housing would break away from the latch mounting plate. (N.T. 581–582). General Motors argued that it was quite obvious that the latch plate broke at the point where the rotor housing attaches to the face plate, (N.T. 584), but that the forces exerted in the accident were so overwhelming that the breaking of the latch hardly evidences a defect.

That significant force was exerted on the door latch seems beyond dispute, and much of the controversy revolves around how significant the force really was. Plaintiffs' expert's version of the impact was that it was "moderate", although he had no opinion as to the pounds of force involved in the impact. (N.T. 428–429). His opinion was based on an examination of certain photographs of the damage to the vehicles. (N.T. 603). Plaintiffs' expert characterized

the accident as a right angle collision but a glancing blow. (N.T. 660–661). The expert further testified that a properly designed door would have stretched along with the movement of the moderate force at the rear of the car and would not have come open. (N.T. 592). It was his opinion that the design should have included more possibility of deformation in the sheet metal on four faces of the door and surrounding area. (N.T. 593). His opinion was that the door could have been made stronger in 1962 and the latch and door were defective because the latch came apart rather than the door deforming and being capable of absorbing the shock of what he characterized as "not such a severe collision". (N.T. 595–597). He testified that the defect in design existed at the time the car left the General Motors factory, (N.T. 597), and there was no other cause to explain the door opening. (N.T. 598). He was asked whether he considered the door unreasonably dangerous and replied:

> "Yes, for the reasons I have described that the car could be hit in such a manner to stretch the side of the car and fail to stretch the door because of the way the door comes apart or the way the latch comes apart."

(N.T. 598).

Defendant General Motors on the other hand described the accident as involving overwhelming force applied to the door latch on the Buick. (Brief of General Motors Corp., pp. 6–12). They cite various portions of testimony and say Defendant Witters was proceeding south on Route 15 approaching the intersection with Route 114, at sixty miles per hour in a 4700 pound Thunderbird, prior to applying his brakes in an effort to avoid the collision. (N.T. 33, 765). Witters applied his brakes and left a skid mark which was, at most, 72 feet in length prior to impact. (N.T. 34, 838). The right front portion of the Thunderbird struck the right rear fender of the Buick behind the right rear wheel, (N.T. 32, 429), with the cars opposing each other at a right angle. (N.T. 619, 661). Assuming that Witters' skid mark prior to impact was 72 feet long, the length described by officer

Elder, Plaintiffs' expert calculated the speed of Witters' Thunderbird to have been 45.7 miles per hour when it struck the Buick. (N.T. 617). If the skid mark had been 40 feet long, the length described by Shen Peir Jeng, the expert calculated that Witters was traveling 51.7 miles per hour at impact. (N.T. 617). There was testimony that after the accident the Buick spun in a clockwise direction and came to rest on the north side of Route 114, west of Route 15, about 66 feet from the point of impact. (N.T. 30, 620). The force of the collision moved the trunk, rear bumper and frame of the Buick from right to left. (N.T. 610). The car was split open on the right side, the right rear portion and fender were pried away, and the "C" post moved to the rear, thereby enlarging the right rear door opening and causing the latch in that door to be destroyed by being physically pulled apart. (N.T. 436–437, 610–612). According to Plaintiffs' expert, the kinetic energy lost by the Thunderbird during the time the vehicles were in contact with each other was 51,000 to 62,000 foot pounds, (N.T. 626, 627, 647), or enough energy to raise a 1,000 pound weight 51 to 62 feet in the air. (N.T. 662–663).

There have been several other cases in which plaintiffs have alleged liability for defective door latches. In *Bair v. American Motors Corp.*, 473 F.2d 740 (3d Cir. 1973), plaintiff appealed from a judgment on a jury verdict in favor of defendant American Motors Corporation. Plaintiff was injured when, in an automobile accident, she was ejected from a 1966 American Motors Rambler. The theory of plaintiff's expert was that had the Rambler been equipped with door latches then used by other automobile manufacturers to prevent opening when the vehicle was subjected to upward and longitudinal stress such as occurred in the accident, plaintiff would not have been ejected. The alleged defect in that case was failure to install a T-head type bolt assembly in a 1966 automobile which had been used by other manufacturers as early as the 1961–1962 model year, and which assembly was significantly more likely to prevent ejection. The case went to the jury which found for American Motors, although a new trial was ordered because of an evidentiary error.

In *Walker v. International Harvester Company*, 294 F.Supp. 1095 (W.D.Okl.1969), the contention of plaintiff, which in view of the conflicting evidence was sufficient to go to the jury, was that the defendant truck manufacturer failed to use a safety door latch then in use in the industry, that the impact from the accident was light but sufficient to cause the door to open with the type of door latch installed, and that had the safety door latch been installed the impact would not have caused the door to open. Defendant contended that the door latch used was proper and conformed with industry practice at that time, other manufacturers of heavy trucks like the one involved used the same door latch at the time, the impact in the collision was violent because the truck was struck near the right front door by a car going approximately 40 miles per hour, and the impact was of such force and location that it caused the door to open, the door would have been forced open even if the safety latch had been installed, and the type of door latch on the truck was not the proximate cause of plaintiff's injuries. The court held the conflicting evidence made it improper to direct a verdict for either party.

In *Melia v. Ford Motor Co.*, 534 F.2d 795 (8th Cir. 1976), Ford Motor Co. appealed a verdict against it on a strict product liability claim under Nebraska law. A jury had returned a verdict finding a design defect in the left door latch assembly of the 1968 Ford Mustang. The plaintiff's theory, and the theory upon which it was ruled the case properly went to the jury, was that the door latch was designed in such a manner that it would open upon very slight impact because it lacked a "fail-safe" mechanism which several other 1968 cars were alleged to contain. Part of Ford's defense was that the force on the latch was overwhelming. The court stated:

"If the door opened due to a *violent* collision with the car then the proximate cause of the fatality was the collision and not the defective latch. If, on the other

hand, the door opened following a slight impact on the door due to the lack of a fail-safe mechanism, a contributing cause of the fatality was the door latch design. This was a question for the jury to resolve from the conflicting testimony—not the court."

(emphasis as in original, footnote omitted). 534 F.2d at 799.

Although we feel the severity of the accident was properly for the jury based upon the conflicting testimony, that does not end the problems of Plaintiffs' proof. General Motors argues that to show a defective and unreasonably dangerous design, Plaintiffs must present evidence of an alternative, safer design, practicable under the circumstances. *Huddell v. Levin,* 537 F.2d 726 (3d Cir. 1976) (applying New Jersey law). Again, while arguably weak, we believe Plaintiffs' proof on this point was sufficient to go to the jury. General Motors' expert, Cockburn, admitted that a car is safer if its doors remain closed in an accident and its occupants are retained in the vehicle. He testified that beginning in the early 1950's that was one of the aims in designing General Motors door latches. (N.T. 900, 912). Cockburn admitted that the weak link in 1963 latch was where the rotor housing was pulled out of the latch plate. (N.T. 928). He further admitted the possibility that a stronger alternative design would be a latch plate of the same thickness as the end plate, (N.T. 944), and that additional welding could create a better design. (N.T. 984). Plaintiffs' expert, Fonda, indicated that a strengthened door latch with more deformable sheet metal on the door faces and surrounding areas would have been an alternative, safer design. Of course all of the testimony as to alternative, safer design hinges on the credibility of Fonda's testimony that the forces in this accident were moderate and produced by a glancing blow rather than the overwhelming forces that General Motors argues were present, as the manufacturer has no duty to create a car that will hold together under any and all circumstances. *Dyson v. General Motors Corp.,* 298 F.Supp. 1064 (E.D.Pa. 1969).

In *Bair v. American Motors Corp.,* 473 F.2d 740 (3d Cir. 1973), *Walker v. International Harvester Company,* 294 F.Supp. 1095 (W.D.Okl.1969), and *Melia v. Ford Motor Co.,* 534 F.2d 795 (8th Cir. 1976), the plaintiffs all alleged that an alternative safer design was in use at the time of manufacture by others in the industry. This was never shown in the present case. On cross-examination of Plaintiffs' expert, Fonda, it was developed that in November of 1964 Cornell Aeronautical Laboratory issued a report entitled, "The Safety Performance of 1962–1963 Automobile Door Latches in Comparison With Earlier Latch Designs". (N.T. 650). The report compared the ability of the door latches in Ford, Chrysler and General Motors automobiles in the 1962–1963 model years to keep doors closed during highway accidents and the witness conceded the report was authoritative. (N.T. 630, 633–634). The Cornell Study concluded that "Latches used in 1963 models brought the three firms (Ford, Chrysler and General Motors) into close alignment with respect to the frequency of door opening and there were no statistically significant differences between makes". (N.T. 633). The Plaintiffs' expert conceded ". . . that the 1963 General Motors door latch was as good as any door latches on the market at that time . . .." (N.T. 634).

Throughout the trial Plaintiffs argued the state of the art was a different concept from the state of the competition, that all of the latches could have been and should have been better designed, and just because all of the major manufacturers were doing about the same did not mean they could not do better. We believe this issue was properly submitted to the jury with the instructions by the trial judge that they would first have to find whether General Motors could have produced a door latch that could withstand greater longitudinal pressure and that would have sufficient strength to withstand the stress generated by the forces of the accident. Then, if they found such a door could have been produced, they were instructed to find whether it created a defective and unreasonably dangerous condition not to do so. (N.T. 1494–1495). The

trial judge further instructed the jury that compliance with the prevailing practices of the industry was evidence to be considered in making that determination, but that it was not conclusive. (N.T. 1495–1496).[5]

It is the law of Pennsylvania that a plaintiff must prove the defective condition of the product was a proximate cause of the accident. *See*, e. g., *Colosimo v. May Department Store Co.*, 466 F.2d 1234 (3d Cir. 1972); *Southwire Co. v. Beloit Eastern Corp.*, 370 F.Supp. 842 (E.D.Pa.1974). General Motors argues that Plaintiffs' case is fatally flawed because insufficient evidence was presented as to the extent, if any, by which the injuries of Jeng and his wife were augmented as the result of their having been ejected from the Cheng Buick. General Motors argues that in second collision cases where the initial accident is not caused by any defect in the vehicle then as a matter of law the manufacturer is not liable for consequences the initial accident would have brought about. Under a second collision theory of liability, it is argued, the liability of the manufacturer should be limited to the augmented, enhanced or increased injuries attributable to the second collision, and that the burden of making this showing is on the plaintiff.

One type of second collision case in which plaintiffs have been successful is where a defective gas tank has caused a fire and the plaintiff's injury consists mainly of burns. *See, Turcotte v. Ford Motor Company*, 494 F.2d 173 (1st Cir. 1974). Obviously a burn is a much different injury than bruises or fractures which typically occur in an accident, and separating the extent of injuries caused by the defect is not as difficult as the case where the bruises or fractures have been made more severe because of the lack of safety features in a car. Insurmountable problems of proof might be presented to a plaintiff in cases where a product is clearly defective and unreasonably dangerous but the injury is incapable of apportionment.

In the present case the jury never reached the question of proximate causation on the special verdict interrogatories because the jurors found the right rear door latch in the Buick was not defective and unreasonably dangerous at the time of the accident. However, General Motors' position is that the Court should have granted a judgment n. o. v. in its favor if a verdict came in against it because of the failure of Plaintiff's proof on causation. As none of the alleged trial errors concern evidence on causation of enhanced injury, any alleged trial error would become academic.

The Court instructed the jury that ". . . any defect, if you find there was one, would have to be a proximate cause of the injuries and death of Mrs. Jeng before there could be liability". (N.T. 1501). He also instructed the jury that:

"Any design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer would be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent of defective design. So if you find that General Motors is liable to the plaintiffs, its liability is limited to such damages as will fairly compensate the plaintiffs for any augmented or additional injuries as were proximately caused by the opening of the right rear door of the Buick Wildcat driven by Ying Che Cheng. If you find that General Motors is liable to the plaintiffs, General Motors is in no event liable to compensate plaintiffs for any damages or injuries which would have occurred as a result of the collision if the right rear door of the Wildcat had remained closed." (N.T. 1500).

Supporting the law presented in the jury charge and General Motors' position, is the recent opinion in *Huddell v. Levin*, 537 F.2d

---

5. It was argued in a dissent in *Melia v. Ford Motor Co.*, 534 F.2d 795, at 802 (8th Cir. 1976), that plaintiff failed to show the design was unreasonably dangerous because, among other reasons, a 1968 Cornell study introduced into evidence showed the Mustang latch was less dangerous in actual collisions than any other latch then being manufactured, however the majority upheld a verdict for the plaintiff in the case.

726 (3d Cir. 1976) (applying New Jersey law). In that case the plaintiff was killed when his car was struck in the rear while stopped on a bridge. General Motors, the manufacturer of plaintiff's automobile, was sued on a theory of defective design of a head restraint. It was alleged that fatal injuries were caused by the impact of plaintiff's head with the head restraint when decedent's car was struck from behind by another car travelling at least 50 miles per hour. Plaintiff's theory was that had the head restraint been designed to spread the impact rather than concentrating it on one part of the skull, the accident would have been "survivable".

The court in *Huddell* indicated that a case involving crashworthiness and second collision impugning the design of an automobile requires three difficult presentations of proof. First, in establishing that a design is defective the plaintiff must offer proof of an alternative, safer design, practicable under the circumstances. We have already dealt with that issue in an earlier portion of this opinion. The second specific proof required in *Huddell* was that plaintiff offer proof of what injuries, if any, would have resulted had the alternative safer design been used, and third, as a corollary of the second aspect of proof, the plaintiff must offer some method of establishing the extent of enhanced injuries attributable to the design defect. *Huddell v. Levin,* supra, at 737. The court pointed out that plaintiff's design expert and physician testified that the accident would have been "survivable" if the head restraint had been designed differently. The court found this testimony inadequate to meet the latter two items of proof. The Court said:

"We recognize the serious problems of predicting the direction of state law in troublesome cases like this and, particularly, we understand the difficulties facing a federal trial court forced to make such a prediction. Upon reflection, however, we are constrained to disagree with the district court's prediction in this case that state law would require G.M. to carry the burden of establishing what damage was attributable to the accident itself as opposed to the allegedly defec-

tive head restraint. 395 F.Supp. at 77. The crashworthy or second collision theory of liability is a relatively new theory, its contours are not wholly mapped, but one thing at least is clear: the automobile manufacturer is liable only for the enhanced injuries attributable to the defective product. This being the essence of the liability, we cannot agree that the burden of proof on that issue can properly be placed on the defendant manufacturer.

Without proof to establish what injuries would have resulted from a non-defective head restraint, the plaintiff could not and did not establish what injuries resulted from the alleged defect in the head restraint. Without such proof, the jury could not have properly assessed responsibility against G.M. for the death of Dr. Huddell."

537 F.2d at 738.

This is the law upon which the jury was instructed in this case, and we believe that it should be accepted as correct until the Pennsylvania courts can provide guidance on the matter. We are mindful of the well-reasoned concurring opinion in *Huddell v. Levin,* 537 F.2d 726, 744 (3d Cir. 1976). The concurring opinion expressed great concern that the second and third requirements can become unreasonably burdensome to an innocent plaintiff. However, the cases involving second collision liability have thus far been consistent with the majority opinion in *Huddell* and we will not depart from that approach. *Larsen v. General Motors Corporation,* 391 F.2d 495, 503 (8th Cir. 1968); *Yetter v. Rajeski,* 364 F.Supp. 105, 109 (D.C.N.J.1973).

Plaintiffs' actual proof on the augmentation of injuries by reason of the allegedly defective door was negligible. Plaintiffs' engineering expert testified that:

"It's considerably more dangerous to be ejected than to be retained in the vehicle. This was the subject of research and scientific discovery in the early 1950's and the rate of injury in accidents of all kinds for people who were ejected was twice that for people who were not ejected.

And the more moderate the accident the higher the ratio. That is it doesn't make a great deal of difference if you are ejected how severely the car is damaged. If you are not ejected, then the severity of the damage to the car does correlate with the injury to the person."
(N.T. 430).

General Motors' expert, Cockburn, who had helped develop the General Motors door latches for a number of years, admitted on cross-examination that occupant retention was one of the goals in designing door latches because it is far better to keep a person in a car in the event of an accident than to have him thrown out because a person ejected from the automobile has a higher risk of injury or death. (N.T. 900).

Plaintiffs' proof of medical causation was presented through a Dr. Bentz who testified that the Jengs' physical injuries were sustained when they struck the pavement outside the vehicle. (N.T. 131, 139). On cross-examination he was asked whether it was conceivable that Mr. Jeng could have gotten his abrasions and cuts even if he had stayed in the car and he gave his opinion that he would not expect to have such a thing occur based on the way the car was hit and damaged and how the accident was described to him. However, under further cross examination he admitted that he could not say for sure whether the same or similar injuries would have occurred had the occupants remained in the car. (N.T. 146–147).

■■■ As far as we can determine this was the extent of the proof as to augmentation of injuries by way of a design defect. Based on the proof, we believe Plaintiffs failed to submit adequate evidence on which a jury could decide what injuries would have resulted had the alleged alternative safer design been used and failed to establish the extent of enhanced injuries attributable to the design defect.

*Evidentiary Rulings*

Even if Plaintiffs' proof was adequate to go to the jury, we believe there were no evidentiary errors which would merit a new trial.

■■■ Plaintiffs complain that the scope of cross-examination of General Motors' expert witnesses Cockburn and Cichowski was unduly restrictive. (N.T. 935–936, 941–942, 1147–1148, 1174–1175, 1177, 1218, 1224, 1246). It was within the discretion of the trial judge to limit the scope of cross-examination in these instances and no error was committed. *Goehring v. Diamond Milling Co.,* 461 F.2d 77 (3d Cir. 1972); *Skeek v. J. C. Penney Company,* 324 F.2d 467 (3d Cir. 1963).

■■■ We find no error in the Court's permitting General Motors to establish by the testimony of its own witness, Cockburn, and on cross-examination of Fonda, that in 1962 the Society of Automotive Engineers (SAE) promulgated a "Recommended Practice for Passenger Car Side Door Latches" which recommended that a door latch be able to withstand a longitudinal load of 1500 pounds when tested in a test fixture as described in the Recommended Practice. (N.T. 635–637, 884–885). Nor was it error to include a reference to the recommended practice in the jury charge. (N.T. 1495). We believe it was proper for the jurors to consider the fact that the door latch was in compliance with prevailing industry practices in making their determination whether the door latch was defective and unreasonably dangerous. Generally the duty of a manufacturer is to provide a reasonably safe version of the particular model car, not substantially less safe than other like models. *Dyson v. General Motors Corp.,* 298 F.Supp. 1064 (E.D.Pa.1969). Certainly if the jurors felt the whole industry should have been doing better and was not, the jury could discount testimony of compliance with industry standards. The Court properly instructed the jurors that compliance with the SAE standard was only one of the factors to be considered by them.

In *Bowman v. General Motors Corp.,* 427 F.Supp. 234 (E.D.Pa.1977), the importance of points of departure or comparison in cases of design choices was pointed out by the Court. Also, one of the factors involved is the expectation of the consuming public, *Cornell Drilling Co. v. Ford Motor Co.,* 241

Pa.Super. 129, 359 A.2d 822 (1976), and Plaintiffs' expert, Fonda, admitted that the General Motors' latch was as good as others on the market in 1963. (N.T. 634). He also admitted there were no federal regulations dealing with the subject at the time. (N.T. 639).

Part of Plaintiffs' argument against use of the 1962–1963 SAE standard is that the recommendation was not formally published until November of 1962, while the design of the door latch in this case occurred in late 1961 and early 1962 for marketing in the latter part of 1962 and the 1963 model year. The recommended practice appeared in public about the same time as the actual models for 1963. There was testimony that the General Motors engineer in charge of the group of engineers designing the latch was a member of the Society of Automotive Engineers Subcommittee and was familiar with the impending recommendation, and that General Motors took the prospective recommendation into account in designing the 1963 model latch. (N.T. 870, 884–885).

Plaintiffs argue that a change in the recommendation promulgated several years later should have been admitted as the 1962–1963 recommendation was allowed in. The exclusion of this evidence was proper as General Motors was entitled to be judged in the light of standards exigent in the industry and known to designers and manufacturers of automobile door latches at the time General Motors produced the Cheng automobile. Occasionally later developments are allowed in evidence to show feasibility of an alternative safer design at the time the particular product was developed, but we do not believe the change in the later SAE recommendation constituted such evidence.

General Motors, over Plaintiffs' objection, was permitted to show a motion picture film to the jury of General Motors' proving ground tests of the 1963 door latch while it was in the development stage. (N.T. 1002, 1006–1009, 1107). The film depicted a number of different tests. One sequence showed a barrier impact at 30 miles an hour to evaluate compressive forces in a door, (N.T. 1108), and another showed a hydraulic snubber which tests longitudinal forces on the door. (N.T. 1108–1109). The film next depicted the peelout phenomenon in the latch which preceded the 1963 version. (N.T. 1110). Next was a snubber test on the 1963 latch which failed when a load of 4,000 pounds was applied, (N.T. 1110), followed by snubber tests on the 1963 latch at 1,600 and 2,000 pounds without failure. (N.T. 1110–1111). Then there was a series of rollover tests, followed by a series of tests in which one automobile was driven into the right rear of another at a 40° angle at speeds of 30, 35 and 40 miles an hour. (N.T. 1112–1113, 1127). Next with pictures of side impact tests to measure the pushout load on the door and latch and a series of impact sled tests with dummies in an automobile to test the rear door latch under transverse loads. (N.T. 1113–1114). These were followed by a series of pictures of a door slamming cycle test by which the doors were opened and closed 50,000 times and, finally were pictures of a test of pushout dynamic forces on a rough road.

Plaintiffs' main argument against the admissibility of this film is the claim that it was introduced to show due care of General Motors and due care is not an issue in a § 402A case, and therefore allowing the film to be shown was error because it was irrelevant and prejudicial. As the motion picture was relevant and admissible on the issue whether the 1963 latch was defective and unreasonably dangerous, the fact that the evidence might also tend to show lack of negligence does not require its exclusion. *See, Bialek v. Pittsburgh Brewing Co.,* 430 Pa. 176, 242 A.2d 231 (1968). The Court properly instructed the jury that Plaintiffs were not required to prove that General Motors was negligent and that General Motors could be liable even if it exercised all possible care. (N.T. 1491). The Court further specifically cautioned the jury on the use of the film:

"You remember, of course, that a film was shown. The film was shown for a very limited purpose. It showed several tests, some were for transverse loads and other loads which admittedly were not an

**1364**

issue in this case although there was testimony, as I heard it, concerning these other loads. I want to emphasize in these tests there was no attempt to simulate the conditions of the accident in this case. You are not to use the film to find that the forces in the accident in this case, and particularly the door latch of the Buick, acted or reacted in a certain way. You were shown the film for two reasons: One, whatever weight you want to give to the fact that some tests of longitudinal loads were performed by General Motors, and: secondly, to aid you in understanding some of the technical evidence in this case.

There was considerable testimony by the experts of how forces react, of energy, energy problems and formulas, you remember, and various other aspects of the law of physics.

Seeing the vehicles under controlled conditions as shown in the test should be of some help in understanding and evaluating this expert testimony, but you are restricted to the two purposes I just outlined to you. To use this film for any other purpose would be a violation of your oath."

(N.T. 1501–1502).

One of General Motors' experts, Cichowski, testified that although instruments to measure longitudinal loads on latches of the type involved in this case were not available in 1961 and 1962, and were still not available at the time of trial in 1975 (N.T. 1188–1189, 1198), the snubber test, the 45° car-to-car impact test, the impact sled test and the rollover test all applied longitudinal loads to the door latch, even though the loads were not precisely measured in the tests. (N.T. 1118–1120, 1134–1135). The film indicated the various aspects of what a door is designed to accomplish, vividly indicating that one cannot design merely for longitudinal loads in a right angle collision.

Although Plaintiffs' argument for excluding the film is not without merit, we do not believe the Court erred in allowing it into evidence.

Plaintiff alleges that the Court erred in allowing General Motors' witness, Cichow-

ski, to testify about his July, 1971, examination of the Cheng automobile, and that photographs taken during that examination should not have been admitted into evidence. Before the witness was allowed to testify in the presence of the jurors, he was examined and cross-examined at length, and an adequate foundation was laid for the admission of his testimony and photographs. (N.T. 1015–1054). *See, Woods v. Pleasant Hills Motor Co.,* 454 Pa. 224, 309 A.2d 698 (1973).

Throughout the pretrial stages of this case the Plaintiffs and General Motors were both apparently less than cooperative in the discovery procedure. The position of both sides was that one would reveal what his expert's theory would be as soon as he knew what the position of the other's expert would be. In balancing what we perceive to be a basic lack of cooperation on the part of both sides, and in reviewing the various attempts by the Court to move the procedure along, we find no prejudicial error in the pre-trial discovery rulings. Such matters are to be handled by the trial court in the exercise of its discretion. *Martella v. Great Atlantic & Pacific Tea Co.,* 418 F.2d 1246 (3d Cir. 1969).

Plaintiffs allege that the Court wrongfully refused to allow Plaintiffs' expert to testify to certain tests he conducted on the type of door latch involved in the accident. The Court was correct in excluding the results of these tests. Plaintiffs' expert, Fonda, conducted three tests and at trial Plaintiffs' counsel attempted to have Fonda testify concerning the three tests he had conducted and the opinions he reached on the basis of them.

The Court sustained General Motors' objections to Fonda's opinions based on the first test because the conditions under which it was conducted differed substantially from those involved in the accident. (N.T. 453, 589–590). Plaintiff does not now complain of the exclusion of this first test, but some background on this test is helpful in understanding the sequence of events and exclusion of Fonda's two subsequent tests.

Fonda was retained by Plaintiffs in the summer of 1973, but did not conduct his first test until March 4, 1975, one week prior to the time the jury was picked for this case, and the day before mutual depositions were taken of experts on both sides of the case. (N.T. 460–534).

The tests which Plaintiffs aver should have been admitted into evidence were conducted on March 11, 1975, and March 12, 1975. The jury was picked for this case on March 11, 1975, and the first day of trial was March 12, 1975. (N.T. 512–513, 542). Plaintiffs' attempt to justify conducting these experiments at such a late date by contending that they were made because of something Plaintiffs' counsel learned at the depositions of General Motors' experts, Cockburn and Cichowski, on March 5, 1975. However, under cross-examination by General Motors' counsel, Fonda indicated otherwise:

> "Q. When did you first recommend to somebody that you be employed for the purpose of performing test number two? A. In the process of test number one, it became apparent that the latch was not pulling, the structure was not reproducing, the surface of the latch was not strong enough to reproduce the deformation, that occurred in the Cheng vehicle and I wanted to obtain further information. So it was approximately March 4th."

(N.T. 534–535).

■■■■■ General Motors objected to any testimony concerning the second and third tests because they were performed while jury selection and the trial were in progress and were not subject to discovery. (N.T. 589–590). Moreover, the expert had been retained in 1973 and stated there was no reason he could not have conducted tests then. The objections to the admission of these tests were properly sustained. *Weaver v. Ford Motor Co.,* 382 F.Supp. 1068 (E.D.Pa.1974). The Court has discretion to exclude evidence not disclosed in pretrial proceedings where the admission of that evidence would create an injustice to the adverse party against whom it is offered. *Moore v. Sylvania Electric Products, Inc.,* 454 F.2d 81 (3d Cir. 1972); *Ely v. Reading Co.,* 424 F.2d 758 (3d Cir. 1970); *Wiggins v. City of Philadelphia,* 331 F.2d 521 (3d Cir. 1964).

■■■ Plaintiffs object to the admission of certain engineering calculations made by Cichowski, one of the General Motors' experts. Basically he gave an opinion on forces exerted in the accident based on trial testimony as to the speed of the Witters' vehicle and length of skid marks on the road. (N.T. 1089–1103). The Plaintiffs' own expert gave his opinion from certain photographs of the damage to the two vehicles that this was a moderate impact, (N.T. 592, 603), and then indicated on cross-examination and redirect how such engineering calculations as were made by Cichowski are computed. (N.T. 617–618, 647). We find no error in the admission of such testimony.

■■■ Nor do we find error in the exclusion of Plaintiffs' Exhibit 35, an expired consulting contract between Plaintiffs' expert Fonda on one side and General Motors and its counsel on the other. This information was put before the jury by Fonda's own testimony. (N.T. 399). Even if such an exclusion was error, which we firmly believe it was not, it certainly was harmless error under Rule 61 of the Federal Rules of Civil Procedure.

We have considered all of Plaintiffs' other contentions in their request for a judgment n. o. v. or a new trial and find them to be without merit.

*Negligence of Defendant Witters*

In addition to suing General Motors on a theory of products liability, Plaintiffs brought a negligence action against the driver of the other vehicle in the right angle collision, Joseph E. Witters. In answers to special interrogatories the jurors found that Witters was not negligent. Plaintiffs argue that they should be granted judgment notwithstanding the verdict alleging that the evidence clearly established the negligence of Defendant Witters. Plaintiffs also allege several trial errors in the case against Defendant Witters and

request a new trial. We find no reason to disturb the jury verdict in favor of Defendant Witters and therefore the motion for judgment n. o. v. and a new trial will be denied.

Plaintiffs argue the evidence clearly established that Defendant Witters was negligent for failing to keep a proper lookout and for a violation of the assured clear distance rule.

An examination of the record in this case indicates that the major question confronting the jurors was whether the Cheng vehicle pulled in front of the Witters' vehicle in such a manner that Witters could not avoid the accident. At least one witness, Mr. Fink, gave that version of the events. (N.T. 763–764). Viewing the evidence in the light most favorable to the Defendant, the jury could have concluded that the Cheng vehicle did pull in front of the Witters' vehicle and that Witters was not negligent. The evidence indicated that Witters made an effort to avoid the accident by applying his brakes and leaving a skid mark as long as seventy-two feet. (N.T. 33–34). He was on a limited access high-speed highway traveling within the speed limit. Whether he should have seen the Cheng vehicle pulling out sooner was properly left to the jury.

Plaintiffs argue that the evidence indicates that Witters violated the assured clear distance rule. The assured clear distance rule, as provided for in the Act of May 1, 1929, P.L. 905, § 1002 (75 P.S. § 1002) as amended, requires a driver to maintain such control as will enable him to stop and avoid obstructions that fall within his vision. *Evans v. Reading Company,* 242 Pa.Super. 209, 363 A.2d 1234 (1976); *Unangst v. Whitehouse,* 235 Pa.Super. 458, 344 A.2d 695 (1975). In an intersection case the application of the assured clear distance ahead rule depends on whether the vehicle proceeding into the intersection arrived in the lane at a point outside of or within an approaching motorist's assured clear distance ahead. *Unangst v. Whitehouse, supra.* Where the evidence is unclear as to whether the obstacle in the path of the motorist entered into his path within the assured clear distance it is proper for the jury to consider the question.

Directly related to the question of assured clear distance in this case is whether there existed a sudden emergency. Although the assured clear distance rule requires a driver to keep his vehicle under such control that he can always stop within the distance he can clearly see, which in darkness will be the scope of his headlights, *Stano v. Rearick,* 441 Pa. 72, 271 A.2d 251 (1970), if it appears that a sudden emergency arose, the rule can become inapplicable. *Reifel v. Hershey Estates,* 222 Pa.Super. 212, 295 A.2d 138 (1972). One claiming the benefit of the sudden emergency rule must establish the alleged emergency by a preponderance of the evidence. *Chadwick v. Popadick,* 399 Pa. 88, 92, 159 A.2d 907 (1960). To claim that he has been subjected to a sudden emergency in driving on the highway it must appear that the motorist was driving with due regard for the condition of the highway and traffic conditions. *Haines v. Delaney,* 424 Pa. 608, 612, 227 A.2d 625 (1967); *Toff v. Rohde,* 208 Pa.Super. 411, 415, 222 A.2d 434 (1966).

Plaintiffs have objected to the charge on sudden emergency. (N.T. 1518). The Court charged on the sudden emergency doctrine as follows:

"The Defendant Witters urges the application of the Doctrine of Sudden Emergency. The rule stated in its best form is that where one finds himself in a position of danger which was not the result of his own negligence, he will not be held responsible if he makes a mistake in judgment in extricating himself from a dangerous situation in which he finds himself. One confronted by a sudden perilous situation not created by some fault of his own is not required to exercise the highest or even an ordinary degree of judgment. One may be legally blameless in spite of an error in judgment where another has placed him in a situation where it would be unreasonable to hold him to the exercise of cool and correct judgment.

The Defendant Witters wants you to apply this principle in this case because of the possibility that you might conclude that he should have acted differently. He contends that under the circumstances you should not hold him to strict accountability for accuracy of judgment because in his view the emergency was sudden and not created by any wrongful act on his part. Bear in mind that to make use of the rule in one's favor, in this case Witters, the party invoking it, which is Mr. Witters, must not have caused the hazardous condition by his own prior negligence and whether or not he is entitled to this rule of sudden emergency, whether or not it was an emergency or whether if so assume, therefore, that it's not or was not due to his negligence are all questions for you to determine under all the evidence in the case. (sic)

When one claims the Doctrine of Sudden Emergency, claims the benefit of it, the Doctrine will not come to his rescue if he himself was so negligent, careless or reckless to cause the situation to arise. In such a case, had he been careful, the peril would not have arisen in the first instance.

The burden of proof in asserting the rule or Doctrine of Sudden Emergency is on the one who asserts it and that burden is by a preponderance of the evidence and I will define that a little later."

(N.T. 1481–1483).

The Plaintiffs' objection to this charge creates the impression that the jury was instructed that it must apply the sudden emergency rule. However, as can be seen above, the Court pointed out that Defendant Witters was urging the application of the rule (N.T. 1482), and instructed the members of the jury that the question of the applicability of the rule was for them to decide.

The Plaintiffs have also objected to the following portion of the Court's charge:

"When one has the right-of-way by virtue of being on a thru street or having a green light, he must not be held to the exact degree of care that would have been required of him had there been no lights or stop sign in his favor at the intersection."

(N.T. 1484).

The objection is based on Plaintiffs' assertion that the charge suggests that the standard of care of a driver at or on a through highway is less than normal. (N.T. 1519). We think this is an inaccurate assessment of the import of this instruction when it is viewed in the context of the remainder of this particular instruction which was as follows:

"To hold otherwise would thwart the purpose of thru highways and traffic lights to facilitate the flow of traffic. One travelling on a thru highway, such as Mr. Witters, has a technical right-of-way although this *did not relieve him from using proper care under the circumstances.* One travelling on a thru highway is not relieved of the duty to drive with due regard for the safety of vehicles entering such thru highway nor is any driver on a thru highway protected from the consequences of an arbitrary exercise of such right-of-way.

The right-of-way of a vehicle on a thru highway is a qualified one and if a driver fails to observe the ordinary precautions in regard to speed and control of his vehicle and keeping a lookout for cars approaching the intersection he may be held to be negligent." (emphasis supplied).

(N.T. 1484–1485).

Plaintiffs argue that the Court erred in charging that a driver on a through highway has the right to assume that the driver on a crossing intersection would obey the law and stop at the stop sign. (N.T. 1485, 1520). *Eisert v. Jones,* 408 Pa. 73, 182 A.2d 717 (1962), *Cericola v. Redmon,* 182 Pa.Super. 19, 124 A.2d 417 (1956). Again Plaintiffs have taken a portion of the charge out of context. The Court charged as follows:

"In determining whether or not Mr. Witters in approaching the intersection was using reasonable care, it must be borne in mind that he had the right to assume within reasonable limits that one

approaching on the intersecting road would obey the law and give him the right-of-way. He cannot be charged with negligence merely because he failed to anticipate the negligence of the other driver, in this case Mr. Cheng. On the other hand, an operator of a vehicle on a thru highway may not, notwithstanding his superior right-of-way, rely blindly upon an assumption that the operator of a vehicle will obey the law. He must be reasonably vigilant to observe traffic conditions on the intersecting highway and if he carelessly ignores the approach of a vehicle after he sees or should have seen it he may or may not be found guilty of negligence. That depends on the fact-finder, in this case the jury."

(N.T. 1485).

This charge properly informed the jury that the right-of-way on a through highway is merely a qualified one. *Enfield v. Stout,* 400 Pa. 6, 12, 161 A.2d 22 (1960).

 Plaintiffs assert that the Court erred in refusing to charge on the doctrine of last clear chance. Last clear chance, at least as it was applied in Pennsylvania before the adoption of comparative negligence, only had a place in determining as between two independent tortfeasors whose negligence was the proximate cause of a plaintiff's injury. *Coleman v. Dahl,* 371 Pa. 639, 92 A.2d 678 (1952). Although we find nothing objectionable in the charge as recommended by Plaintiffs, we believe there was no error in not giving the charge in the particular language requested in their point number 47 (N.T. 1534), as the Court's charge contains sufficient admonitions to the jury that if the situation were created by the negligence of Defendant Witters then the jury should find against him. Plaintiffs make their point on last clear chance in conjunction with their assertion that there was no evidence that Defendant Witters took evasive action to avoid the collision. In fact there was testimony that he hit his brakes and skidded up to seventy-two feet and one witness testified that he swerved to avoid the accident. (N.T. 801). Even if the jury found that Defendant Witters did not swerve to avoid the accident, which given the evidence they could easily

have done, it is recognized that a reasonable man may be excused for a mistake in judgment if the jurors find a sudden emergency was created.

 It is further averred by Plaintiffs that the Court erred in allowing reference to a state police report and testimony from a state policeman. Plaintiffs objected to use of several statements from the report because it was not listed in Defendant's pre-trial memorandum. Since Plaintiffs have not alleged unfair surprise we are of the opinion that it was within the discretion of the Court to allow the statements to be used.

Actually, the police report itself was not admitted into evidence. One witness, Mr. Whitcomb, testified that he observed no traffic coming southbound on route 15 when he stopped at a stop sign traveling behind the Cheng vehicle. He was presented with a prior inconsistent statement he had given to a state trooper and which was contained in the police report and admitted that he had made the statement.

Another statement contained in the police report was read to Third Party Defendant Cheng, and he denied having made it. The statement constituted an admission and was proven by the testimony of the state trooper who stated that he had independent recollection of the statement. (N.T. 813, 824).

Plaintiffs' final objection in regard to the state police report is that it was improperly used as a foundation for the testimony of General Motors' expert. Mr. Cichowski considered the point of impact in making certain calculations concerning the accident. The calculations were not dependent on the state trooper's testimony as the evidence came in prior to that in the testimony of the township policeman, Officer Elder. (N.T. 33–34, 37, 41).

As we stated above, we find no reason to disturb the verdict in favor of Defendant Witters or Defendant General Motors, and will therefore deny the motion for judgment n. o. v. and the motion for a new trial.