551 A.2d 260

Colleen McKEE, a Minor by Ruth McKEE, her Parent and Natural Guardian, and Ruth McKee in Her own Right, Appellants,

v.

Michael P. EVANS, Raymond P. Linden and Mark H. Trecki.

Margaret CARROLL, a Minor, by Olive CARROLL, her Parent and Natural Guardian; and Jacqueline Carroll, a Minor, by Olive Carroll, her Parent and Natural Guardian; and Olive Carroll, in Her own Right,

v.

Michael P. EVANS, Raymond P. Linden and Mark H. Trecki.

Appeal of Margaret CARROLL.

Ricky Joseph WAITE, Appellant,

v.

Michael P. EVANS, Raymond P. Linden and Mark H. Trecki.

Superior Court of Pennsylvania.

Argued Feb. 17, 1988.

Filed Nov. 30, 1988.

124

J. Kerrington Lewis, Pittsburgh, for appellant at No. 00644PGH86.

John A. Caputo, Pittsburgh, for appellant at No. 00691PGH86.

John W. Jordan IV, Pittsburgh, for appellee Michael P. Evans.

Before BROSKY, WIEAND, McEWEN, OLSZEWSKI, BECK, TAMILIA, KELLY, POPOVICH and JOHNSON, JJ.

BROSKY, Judge:

These are consolidated appeals from judgments entered on verdicts after appellants' post-trial motions were denied, as well as from an order granting a new trial limited to damages.

Appellants, Colleen McKee (hereafter "Colleen"), Margaret Carroll (hereafter "Margaret") and Ricky Joseph Waite (hereafter "Ricky") contend that the trial court erred in not granting them a new trial on both liability and damages.

Their specific representations before the court *en banc* concern the alleged erroneous admission of a police officer's testimony relative to the point of impact of a head-on collision between two of the three involved motor vehicles and the trial court's purportedly faulty instructions to the jury that the police officer's testimony on point of impact was based solely upon location of debris at the accident scene.

Appellants secondly challenge the trial court's charge to the jury on the applicability of the sudden emergency doctrine with respect to appellee, Raymond Linden (hereinafter "Linden"), whose negligence the jury found not to be a substantial factor in causing the subject collision.

We also address the issue of propriety of admitting testimony of Mark Trecki concerning his alcohol consumption prior to the accident in question.

■ Because we conclude that the trial court erred in instructing the jury on the applicability of the sudden emergency doctrine to this case, we vacate the judgments entered on the verdicts as well as the order granting a new trial on damages and remand for a new trial on both liability and damages as to all parties.[1]

The operative facts giving rise to the accident which is the subject of the instant appeal are as follows:

1. The Order of January 26, 1988 granting *en banc* consideration, severed the appeals filed at Nos. 707–710 Pittsburgh, 1986, because the parties to the appeals filed at those docket numbers had not moved for reargument. Thus, the only appeals technically before the court *en banc* are those filed at Nos. 644, 691 and 692 Pittsburgh, 1986. Pursuant to our discussion, *infra*, we are awarding a new trial as to all parties on both liability and damages. Our Supreme Court has recently stated that the award of a new trial restores the case to the status it occupied before trial. Hence, that court concluded that, on remand for a new trial, the matter is to be tried *de novo* as to all parties and all issues. Moreover, the court held, an appellate court may *sua sponte* order a new trial as to all parties, including those not presently before the appellate court. *Rivera v. Philadelphia Theological Seminary of St. Charles Borromeo, Inc.,* 510 Pa. 1, 507 A.2d 1 (1986). Consequently, our order awarding a new trial on both liability and damages is effective as to all parties initially appealing to this court, including those who did not pursue application for reargument.

On November 28, 1981, after returning from a trip to the Meadows racetrack with his girlfriend, Arlene Herman (hereafter "Arlene") and another male friend, Linden drove that friend home and then took Arlene to his (Linden's) parents' home. Linden then drove Arlene to her parents' residence, where she also lived. He parked in front of Arlene's home at approximately 2 a.m. At that time, Arlene's parents were at home. After a minute or two, and while Linden and Arlene were still in the vehicle which Linden had been operating and had then parked in front of Arlene's house, Michael Evans (hereafter "Evans"), Arlene's estranged boyfriend, came up the street in his Jeep towards the parked car in which Linden and Arlene were seated. When Arlene saw Evans, she identified the latter as her former boyfriend and told Linden "to get out of there." N.T. 786. Linden had not known that the occupant of the Jeep was Evans prior to Arlene informing him of that fact.

Linden had at first decided to drive around the block, hoping that Evans would leave. Instead, this incident began a ten-to-fifteen minute, ten-mile pursuit of Linden by Evans through the West End of the City of Pittsburgh. During this time, Evans kept bumping the rear of Linden's car and flicking his high beams on and off. Evans also attempted to pass Linden on the latter's left. However, Linden would not allow Evans to pass him because he (Linden) was afraid that if Evans succeeded in passing, Linden would rear end Evans.

Linden indicated that Evans would have physically harmed him if he had pulled over, and he was fearful during the entire episode. Linden did not stop at the police station which he passed because this would have required him to cross over to the left side of the road. Linden feared that Evans' Jeep would have struck him had he attempted to cross over the road to get to the police station.

When Linden reached the top of Windgap Road at the sharp curve, he observed vehicle lights coming towards him from the opposite direction. Linden stated that he was in

the right lane. He then hit the brakes and cut left to attempt to avoid colliding with the vehicle driven by Mark Trecki (hereafter "Trecki") coming from the opposite direction. He could not avoid the accident. Almost simultaneously with the impact from the vehicle driven by Trecki, Evans, according to Linden, rear ended him. Trecki's three passengers are the instant appellants, Colleen, Margaret and Ricky.

## I.

We will first treat the two related issues bearing upon Police Officer Katherine Vallone's (hereafter "Officer Vallone") testimony on point of impact.

## A.

Appellants initially contend that Officer Vallone's testimony amounted to improper opinion evidence as to the *cause* of the accident. Appellants argue that admission of this testimony was error because it called for rendition by a qualified expert.

■ It is true, as appellants posit, that an investigating police officer who did not witness an accident may not render an opinion at trial as to its *cause* unless he/she has been qualified as an expert. *Smith v. Clark,* 411 Pa. 142, 190 A.2d 441 (1963); *Reed v. Hutchinson,* 331 Pa.Super. 404, 480 A.2d 1096 (1984); *Lesher v. Henning,* 302 Pa.Super. 508, 449 A.2d 32 (1982); *Anderson v. Russell,* 33 Pa.D. & C.3d 308 (1983), *aff'd,* No. 151 Harrisburg 1983, *per curiam,* filed August 10, 1984. *See also Commonwealth v. Speelman,* 235 Pa.Super. 109, 341 A.2d 108 (1975).

■ The trial record fails to demonstrate that Officer Vallone was properly qualified as an expert witness. Thus, if we conclude that her testimony concerning point of impact was tantamount to rendition of an opinion as to causation, then, based upon the foregoing authorities, it was improperly admitted as to this matter. The trial record, however, does not support such a finding. Instead, the

record amply demonstrates that Officer Vallone never proffered an opinion as to the *cause* of the accident giving rise to the matter now before us. Hence, it is unnecessary for us to consider whether Officer Vallone's testimony was erroneously admitted without proper qualification. Whether counsel made an adequate offer of proof as to Officer Vallone's qualifications to testify as to the cause of the subject accident is also irrelevant. For as the trial court aptly observed, "[a]nybody could have those qualifications.... Any one of us could do that without even having any police work at all." N.T. 724–25. We agree. Based upon our examination of the various exchanges occurring between Officer Vallone and counsel for appellants on cross-examination and our analysis of the prevailing case law in this Commonwealth, we hold that the testimony proffered by Officer Vallone regarding point of impact was properly admissible as lay opinion.

Officer Vallone had prepared a police report of the accident which included a drawing of the scene as she observed it. In this drawing, Officer Vallone had positioned the three motor vehicles (Evans', Linden's and Trecki's) as she found them upon her arrival at the scene and with a projected line of travel towards the collision for each.

The portion of Officer Vallone's testimony which appellants find particularly objectionable is that concerning her placement of an "X" on the drawing signifying what was, in her belief, the point of impact between the Linden and the Trecki vehicles. The placement of the "X" on the police report diagram was in the north bound lane of traffic. She premised this belief upon the respective positions of the subject vehicles on the roadway and the location of debris at the scene. Officer Vallone also testified that she had spoken with Linden and another witness, Mr. Scheuer, to obtain information concerning the impact. Thus, based upon the positions of the respective vehicles as they appeared to Officer Vallone subsequent to the accident, the location of the debris and her conversations with Linden and Mr. Scheuer, she was able to identify the point of

impact which was represented by the "X" on her police report diagram. N.T. 736.

Officer Vallone, when asked of what the debris which she found at the scene consisted, explained that debris would consist of glass from headlights and dirt from fenders which would have fallen from the vehicles at the point of impact. She indicated that the debris was located "on the wrong side of the road" and that the "X" "was to show that [she] believe[d] the point of impact was on the wrong side of the road." N.T. 748. Officer Vallone could not tell from what distance from the center line she believed the point of impact to be.

The following exchange took place on cross-examination of Officer Vallone by counsel for Margaret:

Q. How far is your X on the drawing from the center line?

A. Not far.

This diagram wasn't made to scale. That was to show what I believe the point of impact was on the wrong side of the road, period.

I don't know how far from the center line, just that it was on the wrong side of the road.

. . . . .

Q. So you don't know how many feet it was from the center line?

A. No, just that it was on the wrong side of the road.

Q. And you have drawn it so that it is more toward the center line than to the right side of the road; is that correct?

A. My point was that it was on the wrong side of the road. What the relationship is to the double yellow line may have just been where my pen fell on the road.

Q. So where you marked the X here, the X could be here or it could be up here; is that correct?

A. Just as long as the point is understood it was on the wrong side of the road.

N.T. 747–49.

Initially, counsel for Linden, on direct, asked Officer Vallone the basis for her *belief* where the point of impact had occurred between the Linden and the Trecki vehicles, i.e., the placement of the "X" on her police report diagram.

BY MR. ROSENBERG

Q. Now, Officer, you have in the photograph in the position between the resting place of the Linden and Trecki vehicle an X?

A. Yes, sir.

Q. Would you tell us what that identifies?

A. That identifies what I believe to have been the point of impact.

Q. And on what do you base that belief, Officer?

A. The debris on the roadway.

Q. All right. Did you also talk to a witness?

A. Yes, sir, I did.

Q. What was his name?

A. Nick Scheuer.

Q. Did you talk to him that night?

A. Yes, sir, I did.

Q. Did information received from him help you identify the point of impact?

A. Yes, sir, it did.

Q. Did you also talk to some of the occupants in the car, in the several cars?

A. Yes, sir.

Q. Do you remember who they may have been?

A. According to my reports [sic] I spoke with the operator of the second vehicle which would have been Mr. Linden.

Mr. Lewis: I didn't hear that, your Honor.

A. According to my reports I spoke with Mr. Linden who would have been the operator of the second vehicle, as well as the witness.

BY MR. ROSENBERG:

Q. So that you observed the positions of the vehicles as they existed, you saw the debris on the roadway, you talked to the witness and Mr. Linden and *from that you identified, from all of those things you identified the point of impact?*

A. *Yes, sir.*

N.T. 735–36. Emphasis supplied.

It is evident from the foregoing that Officer Vallone based her testimony as to point of impact upon discernible factors: her observation of the location of the debris on the roadway, the positions of the respective vehicles as she found them upon her arrival at the scene of the accident and her conversations with Mr. Scheuer, an eyewitness, and Linden. Additionally, counsel for appellants requested Officer Vallone to recount her observations based upon the diagram which she drew on her police report. She reiterated numerous times on cross-examination that her purpose in placing the controversial "X" on the diagram was to show where the point of impact had been, based upon the foregoing events—the settlement of the debris, the resting places and positions of the vehicles in the aftermath of the collision and her interviews with Mr. Scheuer and Linden. Thus, Officer Vallone based her testimony on her police report which consisted of the drawing of the accident scene as she observed it and her interview notes.

Appellants rely on several cases which they urge this court to accept as dispositive of their contention that the substance of Officer Vallone's testimony went to the cause of the accident and, therefore, should have been disallowed. Our perusal of these authorities plus others which we deem more persuasive to the contrary forces us to decline appellants' invitation.

In *Smith v. Clark, supra,* the Pennsylvania Supreme Court awarded a new trial based upon the erroneous allowance of a police officer's opinion testimony that the *cause* of the accident there was due to the driver's failure to react in a manner which would have enabled him to execute a curve

in the road. Since the officer in *Smith* was not an eyewitness to the event, the Supreme Court held as speculative and an invasion of the jury's province his opinion as to the ultimate issue. Moreover, the Supreme Court considered the Officer's opinion that the accident occurred because of the driver's failure to appropriately respond to a curve in the road as highly prejudicial. In *Lesher v. Henning, supra,* a non-eyewitness police officer who arrived upon the scene to investigate an automobile accident, was asked at trial directly whether the *cause* of the accident was appellant-driver's failure to stop at the stop sign upon arriving at the intersection:

Q. [COUNSEL FOR APPELLEE]: Would you tell us, as a result of your investigation, *did you make a determination of how this accident occurred?*

A. [TROOPER PREBULA]: Yes, I did.

Q. [COUNSEL FOR APPELLEE]: Yes. Was there any indication of your investigation as to *whether or not the Lesher automobile had stopped at the stop sign before entering the intersection?*

A. No, it did not.

*Id.* 302 Pa.Super. at 512, 449 A.2d at 33–34; first emphasis added; second emphasis in text. This court held, in granting a new trial based upon the Trooper's improper rendition as to the cause of the accident, that the above testimony was not based upon analysis of the physical evidence at the scene but, rather, was premised solely upon what was related to him by two eyewitnesses. In other words, the Trooper in *Lesher* arrived on the scene and interviewed witnesses. At trial, he then stated his opinion as to the *cause* of the accident based simply upon the witnesses' version of how the accident occurred. The *Lesher* court rejected this conclusion, even though it was corroborated by other witnesses. Again, in *Reed v. Hutchinson, supra,* a police officer who did not witness the mishap testified on direct that he had observed cut marks on the road at the scene of the accident. On cross-examination, he was asked if the wheel markings were the result of wheel dislodgement. After objection concerning his non-presence at the

time the accident occurred and his inability to support this conclusion as a result of his lack of expertise, he was then asked, based on his observations at the scene and his interviews of other witnesses, whether he was able to ascertain if the offending wheel had come off before or after the vehicle to which it had been attached had hit the guard rail. This query elicited the following response:

Q. Would you state your opinion, sir.

A. Yes, sir. It was my opinion, after observing the scene and observing the vehicles, that the accident was a result of the front wheel, the front right wheel, of the vehicle becoming dislodged or dislocated for some unknown reason from the vehicle itself *causing the operator to loose control and veer to the right and striking the guardrail, and coming to rest at the same.*

*Id.* 331 Pa.Super. at 409, 480 A.2d at 1099; emphasis added.

While it is true that Officer Vallone also based her opinion regarding point of impact from interviews with witnesses and her inspection of the accident scene for physical evidence—i.e., the fallen debris and the resting positions of the respective vehicles involved, she merely utilized this information in formulating her opinion on the initial point of impact or, in other words, on the location of the actual collision between the Linden and the Trecki motor vehicles. This is distinguishable from the situation in *Reed* where the officer testified categorically that the driver had lost control as a result of his wheel becoming dislodged, causing him ultimately to hit into the guard rail. The court then quite properly rejected his testimony as tantamount to rendering an opinion as to causation. However, the testimony of Officer Vallone does not reflect that she gave any similar unequivocal, causative responses.

Similarly, in *Anderson v. Russell, supra,* this court affirmed the trial court's grant of a new trial premised upon the Chief of Police's interjection of his assessment of point of impact at trial between the minor plaintiff's bicycle and a truck. The Chief did not witness the accident. The trial court held, however, that he could not offer his opinion on point of impact based merely upon gouge marks in the

roadway. The trial court and this court, in affirming, reasoned that Chief Frey's testimony was tantamount to expressing his opinion as to the cause of the accident without the prerequisite qualification as an expert. Most significantly, the trial court held that the Chief could properly testify as to what he observed at the accident scene, including any marks in the road. However, since the trial court found, and we agreed, that the gouge marks did not even conclusively indicate any point of impact, it logically concluded that the Chief could not have offered any testimony bearing upon the point of impact between the bicycle and the truck, let alone testify as to the cause of the mishap.

Officer Vallone's references, while to point of impact, were nevertheless based upon her observations at the accident scene, which included, as we have stated before, the vehicles' positions, the location of the debris on the roadway and her conversations with Mr. Scheuer and Linden. A composite of these factors formed her assessment as to location, not cause, of the subject accident, or, in other words, the point of impact.

Instead, we find *Commonwealth v. Speelman, supra,* and *Ernst v. Ace Motor Sales, Inc.,* 550 F.Supp. 1220 (E.D.Pa.1982), *aff'd,* 720 F.2d 661 (3d Cir.1983), to be controlling here. In *Speelman,* a police officer who did not witness the occurrence of the accident was interrogated at trial as to his inspection of the accident scene. He was asked to render an opinion as to *where he believed the accident occurred, not as to its cause.* His response was based upon his observations, at the scene, of the oil, debris and gouge marks. This court upheld the trial court's decision to permit his testimony at trial. Here, too, Officer Vallone's testimony consisted of her opinion as to the location of the collision, i.e., the hotly controverted point of impact. As did the *Speelman* court, we, too, also have difficulty perceiving in what respect Officer Vallone's testimony could have risen to the level of establishing causation when she only opined as to where the accident had occurred.

In *Ernst, supra,* a police officer who did not witness the accident but who arrived on the scene within five to ten minutes thereafter was permitted to testify in response to plaintiff's counsel's query, "Were you able to ascertain whether the debris was from the Ernst vehicle.", as follows, "It [sic] my opinion that it did." At 1223. The connection between the debris and the plaintiff's car was a trail leading from a point on the roadway to plaintiff's vehicle. The United States District Court for the Eastern District of Pennsylvania held that the Officer's testimony regarding impact and location of debris was, first, lay opinion testimony, since the testifying officer did not see the accident occur. Secondly, and significantly, for our purpose, the District Court determined that this type of lay opinion testimony was admissible under Federal Rule of Evidence 701 which reads:

Rule 701. Opinion Testimony by Lay Witnesses

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

The District Court then concluded that the officer's testimony concerning point of impact was based upon his perception of the physical evidence which he found at the scene. The *Ernst* court reasoned, we believe, soundly:

The officer's logic was simple—the accident occurred where the largest concentration of debris was found and dissipated in the direction in which the car proceeded to point of rest. This opinion was ... of such a nature as to be helpful to a jury. A trial judge may exercise discretion to admit lay opinion testimony ... and under the circumstances of this case that discretion was not abused.

At 1223; citations omitted.

■ The import of the above rationale is clear. A lay witness' opinion testimony is admissible so long as it is

based on his/her perception of that which he/she observes and would be helpful in clarifying an ultimate fact for the trier. The *Ernst* court also found that it matters not that the proffered opinion testimony touches upon an ultimate issue. This conclusion logically flows from a reading of Federal Rule of Evidence 701(b) *supra*, and, in conjunction therewith, Federal Rule of Evidence 704, both of which were relied upon by the *Ernst* court: [2]

Rule 704. Opinion on Ultimate Issue

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

In *Lewis v. Mellor*, 259 Pa.Super. 509, 393 A.2d 941 (1978), this court, in rejecting the prior prohibition on the admission of opinion testimony going to the ultimate issue in a case, adopted as part of the law of this Commonwealth Federal Rules of Evidence 701 and 704, *supra*, four years before *Ernst* was initially decided by the United States District Court and five years before its affirmance by the United States Court of Appeals for the Third Circuit. There we stated:

We believe that the Federal Rules represent the best approach to the opinion evidence problem. We therefore now adopt that approach as our own. In taking this action, we are conscious of moving beyond the present cases. It is of the essence of the law, however, that it evolves in response to experience and thoughtful criticism; of no aspect of the law is this more true than of the law of evidence. Our action, moreover, is hardly radical or far reaching. The witness stand is not now opened to witnesses who would act like the oath-swearers of the early centuries; nor do we intend that our trials become parades of influential opinion givers. *See* Advisory Committee Notes to Rule 704. Personal knowledge remains a prerequisite to the admissibility of an expression of lay opinion. We do no more than abandon rules that have

---

**2.** Since the *Ernst* decision, this Rule has been amended to include an exception inapplicable to the matter now at hand.

proved difficult both of articulation and application. If the trial judge decides that the proffered opinion would not be helpful, or even if helpful, would confuse, mislead, or prejudice the jury, or would waste time, he may exclude it. *See* Advisory Committee Notes to Rule 704. On appeal, the judge's discretion in this regard will be respected, and reversal will occur only in those cases where the discretion has been clearly abused, and actual prejudice has occurred.

Id., 259 Pa.Superior Ct. at 523–24, 393 A.2d at 949.

Appellants posit that Officer Vallone's testimony concerning point of impact was erroneously admitted as going to the ultimate fact in issue—a determination of negligence or not—thus leaving nothing for the jury to consider based upon the facts presented and the potentially prejudicial impact her testimony would have because of her status as a police officer. However, as we wrote in *Lewis, supra:*

[T]he ultimate issue rule has been criticized because of the inherent difficulty in deciding what constitutes an ultimate issue in the particular case. See Note, *Opinion Testimony Invading the Province of the Jury,* 20 U.Cinn.L.Rev. 484, 486–88 (1951). Moreover, the rationale for the rule, that ultimate issue opinion should be excluded because it 'usurps' the jury's function, has been labelled 'mere empty rhetoric', because no witness can usurp the jury's function even if he wants to. 7 Wigmore, *supra,* § 1920; Note, *supra,* at 486; *see Grismore v. Consolidated Products,* 232 Iowa 328, 5 N.W.2d 646 (1942). If the word 'usurp' is put aside, and the ultimate issue rule considered as prohibiting opinions that might lead the jury to forgo an independent analysis of the case, still the question remains whether any ultimate issue lay opinion does have such an effect. The opinion cannot prevent an independent jury decision; the jury is still free to decide. Moreover, it is at best doubtful that a jury is influenced more by opinion testimony on the ultimate issue than it is by fact testimony on the ultimate issue; yet we do not exclude fact testimony on the ultimate

issue. See Note, *supra*, at 485–87. If a jury reaches the same conclusion as that offered by the lay witness, it seems more likely that the jury interpreted the facts in the same way and accepted the witness's opinion because it fit the facts, than that it failed to make an independent analysis of the facts merely because it happened to hear an opinion. Where the opinion is not supported by the facts, that may be pointed out by cross-examination and argument, and the jury persuaded to reject the opinion. *See* Ladd, *Expert Testimony*, 5 Vand.L.Rev. 414, 415–17 (1952); Note, *supra*, at 486–87. Thus the ultimate issue rule is predicated more upon a distrust of jurors than upon a realistic appraisal of the effect of admitting the opinion. Such an attitude does not constitute a proper basis for an evidentiary rule. *See* Weinstein, *The Ohio and Federal Rules of Evidence*, 6 Capitol U.L.Rev. 517, 520–21 (1977). Moreover, any rule that requires reversal, simply because the opinion was 'unnecessary' or because it went to the 'ultimate issue' is too broad, for it assumes the existence of reversible prejudice in every case.

Id., 259 Pa.Superior Ct. at 520–21, 393 A.2d at 947–48; footnote omitted.

■ The rationale set forth in *Lewis* for incorporating these evidentiary rules into the jurisprudence of this Commonwealth is predicated upon a deference to the trial court's discretion in deciding whether lay opinion testimony would be helpful to the jury, thus avoiding the resolution of theretofore difficult questions concerning the necessity of the opinion testimony or whether it would embrace an ultimate issue. In place of this problematic dual-pronged test of admissibility, the *Lewis* court explained that the trial judge need only consider the helpfulness of such testimony, checked solely by its potentially confusing or prejudicial impact upon a jury. Only when an appellate court concludes that prejudicial error was manifest in the admission of lay opinion will the trial court's decision be reversed.

■ Thus, forsaking assessment of these previously troublesome concepts and in furtherance of the salutory rule

effectuated, we now only require the trial court to view the proffered testimony, if based on the witness' perceptions, in light of its helpfulness to the jury in the latter's deliberation of the ultimate issue. If the trial court so concludes, it must further the inquiry to ensure that the lay opinion proffered will not unduly confuse or prejudice the fact finder. When this two-step analysis has been completed, the court will either admit or exclude the lay opinion testimony.

Applying *Ernst* to the facts of the case at bar, we conclude that Officer Vallone's testimony was based upon her perception of what she discerned at the scene of the accident—the location of the debris and the ultimate resting positions of the motor vehicles involved in the accident. Her conversations with Mr. Scheuer and Linden also involved an interplay between her observable perception and what these witnesses related to her. The *Ernst* court held, as we do here, that that officer's testimony only went to localization of the accident, not to its cause.[3]

3. The *Ernst* court does not cite our decision in *Lewis, supra,* even though *Ernst* followed *Lewis* by four years. We can proffer no explanation for this omission except, perhaps, that counsel in the *Ernst* case did not bring our decision in *Lewis* to the attention of the District Court. The District Court opinion only informs us of the inapplicability of state (Pennsylvania) evidentiary law to *Ernst.* The court there states, instead, that *Ernst* is governed directly by the Federal Rules of Evidence. However, in a footnote, the *Ernst* court cites Pennsylvania cases, which held as inadmissible opinion testimony going to the cause of the accident. The District Court considered these authorities to be inapposite to the situation in *Ernst* because the police officer's testimony in that case was limited to relating where the accident had occurred, not to its cause. Instead, the District Court likened the testimony rendered by the police officer in *Ernst* to that given in *Morris v. Moss,* 290 Pa.Super. 587, 435 A.2d 184 (1981), by a non-eyewitness police officer who testified as to the speed of a vehicle by analyzing skid marks. The *Ernst* court determined, correctly we think, that testimony concerning the speed of a vehicle (*Morris* ) and point of impact (*Ernst* ) are similar because both relate to the circumstances surrounding the accident. On this basis, the *Ernst* court concluded that the police officer's testimony there would be equally admissible under Pennsylvania law.

Hence, we would be acting not injudiciously were we to state that we are much enlightened and embrace the rationale adopted by the *Ernst* court. We are further prompted in this regard by our own

Having determined that Officer Vallone's testimony was based upon her perception of all of the events relating to the accident, including her conversations with the two witnesses, we would be remiss concluding that her testimony was not helpful to the jury in aid of its factfinding role. Officer Vallone testified as to where she believed the accident had occurred. She premised this belief on discernible observations at the accident scene. The jury heard this testimony and, from the facts presented, it was free to arrive at an independent, unbiased decision. As evidenced by its verdict, the jury accepted her opinion as to impact because, more likely than not, that opinion fit the facts as the jury found them to be.

■ Moreover, any potentially prejudicial impact Officer Vallone's testimony might have had (which, we hold, it did not) was generated by counsel for appellants' repeated solicitation of Officer Vallone's now objected-to opinion as to point of impact. Counsel, in effect, had succeeded in stirring up a hornet's nest on cross-examination by asking questions, typical among which are by counsel for Colleen as follows:

Q. There has been testimony here that the Linden car slid. Would that make a difference *in your opinion* regarding debris if a car slid after impact?

A. Yes, it would.

N.T. 758; emphasis added.

. . . . .

Q. In any event, Mr. Evans' car or Mr. Linden's car is shown behind the point of impact and this is not to scale. *Can you give us a distance what your opinion was?*

A. No, I can't.

N.T. 759; emphasis added. Counsel for Arlene also queried:

Q. Officer Vallone, I don't want to belabor this, but the point of impact is very important to all of us and *you*

court's adoption of Federal Rules of Evidence 701 and 704. *Lewis, supra.*

*have an opinion as expressed in your police report as
to the point of impact,* correct?

A. Yes, sir.

Q. And, of course, you were not an eyewitness to this
accident so what you are giving us is *your opinion based
upon things that you saw and things that you learned
at the accident scene* ?

A. Yes, sir.

N.T. 761–62; emphasis added.

. . . . .

Q. And I believe that you have been trying to tell us
that *it is [sic] your opinion as to the point of impact
was based upon several things, one of which was your
conversation with Ray Linden* ?

A. Yes, sir.

N.T. 762; emphasis added.

. . . . .

Q. Now, you told us that one of the other factors that
caused you *to form the opinion as to the point of
impact was the debris* ?

A. Yes, sir.

N.T. 763; emphasis added.

. . . . .

Q. And would I also be correct in stating that *you
couldn't tell us at this point what the debris was that
caused you to form that opinion* ?

A. I'd say that it is the normal debris that is there after
a collision.

N.T. 764; emphasis added.

Hence, we do not find this testimony prejudicial since, as
we have already stated, counsel for the very appellants who
now complain had effectively opened the door to such
testimony. *Ernst, supra. Cf. Sweener v. First Baptist
Church,* 516 Pa. 534, 533 A.2d 998 (1987) (appellant's intro-
duction of testimony on assumed point of impact is con-
ceded on cross-examination to be merely speculative; appel-
lant cannot then complain about its introduction when the

basis therefor is revealed on cross-examination). Any undue weight which the jury may have accorded to Officer Vallone's testimony was occasioned by this type of persistent interrogation, whatever its intended tactic may have been. The testimony of Officer Vallone was, as we have stated elsewhere in this Opinion, admissible as lay opinion. *Lewis, supra; Ernst, supra.* We do not perceive our role to be appellants' advocate when their counsel now voice objection to the admission of the very testimony which they elicited at trial. Appellants cannot be heard to complain about any potentially prejudicial effect created by the strategies of their own counsel.

### B.

With regard to appellant's second argument that the trial court's charge to the jury unduly emphasized the location of the debris as being the single most important factor in locating the point of impact we find no support in the record. The foregoing discussion exhaustively recounts the components which factored into Officer Vallone's evaluation of the point of impact. We need not repeat that analysis here. The trial judge cautioned the jury that it had the responsibility for recalling the evidence adduced and determining the facts. He also instructed that body that Officer Vallone's testimony regarding the debris was one for its (the jury's) determination as to her credibility. In other words, Officer Vallone's testimony that the point of impact was based upon the location of the debris went to its evidentiary weight, not to its admissibility, to be determined by the jury. *See Ernst, supra.* The trial court charged:

The debris can't be mistaken and the only question is the credibility of Officer Vallone in what she said, whether she correctly observed it, noted it, and spoke directly or credibly about it. Of course the location of the debris is of great importance and you also had photographs of the cars.

N.T. 896.

It is now well established in this Commonwealth that portions of a jury charge are not reviewed for error in

isolation. Rather, an appellate court is bound to examine the charge in its entirety against its evidentiary background. From that examination we must determine, first, whether any error was committed and, if so, whether the error was prejudicial to the complaining party. *Reilly by Reilly v. SEPTA*, 507 Pa. 204, 489 A.2d 1291 (1985); *Elder v. Orluck*, 334 Pa.Super. 329, 483 A.2d 474, *aff'd* 511 Pa. 402, 515 A.2d 517 (1984). Moreover, while the trial judge must present a balanced view of the evidence in his/her charge, it is well within the bounds of the trial court's discretion to summarize the evidence adduced at trial in light of the prevailing circumstances of the case. *Noecker v. Johns–Manville Corp.*, 355 Pa.Super. 463, 513 A.2d 1014 (1986).

 Our review of the record testimony of Officer Vallone and of the trial judge's charge to the jury in its entirety leads us unqualifiedly to conclude that no abuse of discretion was committed here in admitting Officer Vallone's testimony, nor was the trial court's charge to the jury regarding the point of impact erroneous or unduly prejudicial. As the trial record amply demonstrates, the location of the debris was only *a* factor in Officer Vallone's evaluation of where the point of impact occurred. Consequently, appellants cannot be awarded a new trial on either bases.

## II.

Colleen, Margaret and Ricky also claim entitlement to a new trial based upon the erroneous instruction of the trial judge to the jury on the applicability of the sudden emergency doctrine to the facts of the instant case. We agree with the appellants that the giving of this instruction constitutes reversible error mandating a new trial. Appellants do not challenge, nor does our decision here hinge upon, the correctness of the law given in or the substance of the charge. Rather, the gravamen of their argument and the predicate for our decision to award a new trial here focus

on the doctrine's inapplicability, in the first instance, to the matter at hand.

The objected-to portion of the charge reads as follows:

So there is this point submitted in behalf of Raymond Linden, very similar to the point which I read which was submitted on behalf of Mr. Trecki, to the effect that if Raymond Linden was driving under the stress of a sudden emergency, not the product of his own negligence, his action in attempting to extricate himself and his passenger from the emergency situation should not be judged by the same standard of due care as would be required of him had he had an opportunity to reflect on his course of action and to act upon his reflections and when we speak of a sudden emergency it is true that this was a continuous thing, this chase, but at all times it was an emergency type situation because the car was coming along and hitting him according to Linden at at least ten times, although Evans contends it was only several times.

N.T. 889–90.

### A.

▮▮▮▮ Before proceeding to analyze the sudden emergency doctrine as it has been interpreted by the appellate courts of this Commonwealth, we reiterate that an objectionable portion of a jury charge is not to be examined in isolation for error. Instead, the charge is scrutinized in its entirety to determine whether error, if present, was prejudicial to the affected party. *Reilly v. SEPTA, supra; Elder v. Orluck, supra.* The trial judge is bound to charge only on the law applicable to the factual parameters of a particular case. It is also well recognized that a trial judge may not instruct the jury on law inapplicable to the matter before it. *See Hamely v. George,* 365 Pa. 543, 76 A.2d 181 (1950) (new trial awarded where court erroneously instructed on inapplicable doctrine of permissive crossing); *Speer v. Barry,* 349 Pa.Super. 365, 503 A.2d 409 (1985), *appeal denied sub nom Barry v. Johns,* 514 Pa. 623, 522 A.2d 49 (1986) (failure to charge jury on contributory negligence

when in issue constitutes reversible error); *Nye v. Com. Dept. of Transportation*, 331 Pa.Super. 209, 480 A.2d 318 (1984) (instruction that jury could award damages for pain and suffering error when not applicable to case). Nor may the trial court *sua sponte* interject novel theories into the charge which have not been propounded by the parties. *See Brown v. Schriver*, 254 Pa.Super. 468, 386 A.2d 45 (1978) (*sua sponte* interjection of charge on sudden emergency doctrine erroneous when appropriate charge was on assured clear distance ahead rule); *Hrivnak v. Perrone*, 472 Pa. 348, 372 A.2d 730 (1977). The function of the trial court in charging the jury is not that of an advocate but, rather, is to crystallize the applicable issues raised by the parties and to explain the principles of law germane to those issues. *Id.*

### B.

With this in mind, we now proceed to explain our refusal to find a sudden emergency, as interpreted by the courts of this Commonwealth, on the facts of the instant case.

This rule has been invariably defined by our courts: The 'sudden emergency' doctrine is available as a defense to a defendant who suddenly and unexpectedly finds himself confronted with a perilous situation that permits no opportunity to assess the danger and respond appropriately. *Carpenter v. Penn Central Transportation Co.*, 269 Pa.Super. 9, 409 A.2d 37 (1979); *Stacy v. Thrower Trucking, Inc.*, 253 Pa.Super. 150, 384 A.2d 1274 (1978). The doctrine is successfully applied as a defense where the defendant proves that he did not create the emergency, *Westerman v. Stout*, 232 Pa.Super. 195, 335 A.2d 741 (1975); *Toff v. Rohde*, 208 Pa.Super. 411, 222 A.2d 434 (1966), and where he responded in a reasonable fashion. *Westerman*, supra; *Johnson v. Pennsylvania Railroad Company*, 399 Pa. 436, 160 A.2d 694 (1960). The party confronting the peril simply is not expected to exercise that same degree of care mandated by normal and foreseeable circumstances. In fact, he is not re-

quired to exercise the highest or even an ordinary degree of judgment; therefore, he will not be responsible for any mistake of judgment in extricating himself from the impending dangerous situation.

*Chiodo v. Gargloff & Downham Trucking Co.*, 308 Pa.Super. 498, 500–01, 454 A.2d 645, 646 (1983). *Accord Papandrea v. Hartman*, 352 Pa.Super. 163, 507 A.2d 822 (1986); *Elder, supra; Sagan v. Destefano*, 329 Pa.Super. 360, 478 A.2d 828 (1984); *Carpenter v. Penn Central Transp. Co.*, 269 Pa.Super. 9, 409 A.2d 37 (1979). The rule arises "where ... because of the shortness of time [with] in which to form judgment in an emergency not created by his own negligence [ ] [the actor] fails to act in the most judicious manner...." *Noll v. Marian*, 347 Pa. 213, 215, 32 A.2d 18, 19 (1943). It implies the "failure to perform a duty so suddenly and unexpectedly arising that there was no opportunity to apprehend the situation and to act according to the exigency." *Id.*, 347 Pa. at 215, 32 A.2d at 19; *Moore v. Meyer & Power Co.*, 347 Pa. 152, 154, 31 A.2d 721, 722 (1943); *Sagan, supra* 329 Pa.Super. at 368, 478 A.2d at 832. *Accord McElroy v. Rozzi*, 194 Pa.Super. 184, 166 A.2d 331 (1960). "The purpose of the sudden emergency doctrine is to relieve a victim from the sometimes stringent reasonable man standard when he is confronted with an occurrence that permits no opportunity to apprehend the situation and act accordingly." *Carpenter*, 269 Pa.Super. at 16, 409 A.2d at 40. It flows from "an occurrence requiring some form of immediate, evasive action." *Id.*, 269 Pa.Super. at 16, 409 A.2d at 40.

This doctrine has been applied most often in motor vehicle accident cases where the operator was confronted with a perilous, often life-threatening situation requiring spontaneous response to avoid the impending danger of a collision. *Carpenter, supra.* One invoking the defense of sudden emergency cannot be responsible for creating that very peril and is ordinarily excused from liability because he lacked the time to react as he would have done under otherwise foreseeable circumstances.

Thus, one driving carelessly or recklessly cannot avail himself of the rule's protection, since, normally, the peril would not have arisen in the first instance. *Chadwick v. Popadick*, 399 Pa. 88, 159 A.2d 907 (1960); *Downey v. Rymorowicz*, 397 Pa. 205, 154 A.2d 179 (1959); *Levine v. Mervis*, 373 Pa. 99, 95 A.2d 368 (1953); *Arble v. Murray*, 359 Pa. 12, 59 A.2d 143 (1948); *Randolph v. Campbell*, 360 Pa. 453, 62 A.2d 60 (1948); *Nark v. Horton Motor Lines, Inc.*, 331 Pa. 550, 1 A.2d 655 (1938); *Hollern v. Verhovsek*, 220 Pa.Super. 343, 287 A.2d 145 (1971).

■ Nonetheless, one in the unenviable position of confronting a sudden emergency, not of his own making, will not be responsible for exercising what later turns out to be mistaken judgment in extricating himself from the peril if no time existed to reflect upon a more prudent course of conduct. All the law has required is an honest exercise of judgment even if, upon hindsight and with time to consciously deliberate, the actor could have performed differently. *Sagan, supra; Potenburg v. Varner*, 284 Pa.Super. 19, 424 A.2d 1370 (1981); *Carpenter, supra; Hartman v. Gieraltowski*, 198 Pa.Super. 316, 181 A.2d 688 (1962); *Anderson v. Perta*, 138 Pa.Super. 321, 10 A.2d 898 (1940).

■ That which gives rise to the emergency must come about suddenly, without warning, and any action taken to save oneself from the sudden peril must occur spontaneously without time for deliberate reflection. *Arble, supra; Moore, supra; McElroy, supra.* Otherwise, if the actor has time to avoid the ultimate mishap and fails to act accordingly, the emergency ceases to be. *Downey, supra; Carpenter, supra.* This is consistent with the well-settled holding of our courts in the context of motor vehicle accident cases that a sudden emergency presupposes the unexpected interjection of a moving object or instrumentality into a driver's path of travel.[4] *Brown, supra.* Ac-

4. Since the application of the sudden emergency doctrine has not been confined strictly to vehicle accident cases, this definition, perhaps, applies to the classic sudden emergency vehicle case. Other situations in which a sudden emergency had been successfully in-

*cord Elder supra; Hanlon v. Sorenson,* 289 Pa.Super. 268, 433 A.2d 60 (1981). Consequently, evidence of confrontation with pre-existing, static road conditions does not properly call for an instruction on the applicability of the sudden emergency doctrine. *Brown, supra* (gravel on roadway constitutes stationary object on road rather than something unexpectedly thrust into a driver's lane of travel); *Hanlon, supra* (same); *Haines v. Dulaney,* 424 Pa. 608, 227 A.2d 625 (1967) (blind curve on roadway is preexisting condition); *McErlean v. McCartan,* 280 Pa.Super. 531, 421 A.2d 849 (1980) (wet road is preexisting, static surface condition); *Sullivan v. Wolson,* 262 Pa.Super. 397, 396 A.2d 1230 (1978) (snow and ice on road are preexisting road conditions).

Situations other than moving objects also may qualify to successfully invoke the sudden emergency doctrine. A typical but non-exclusive list includes the appearance of a dust cloud, *Unangst v. Whitehouse,* 235 Pa.Super. 458, 344 A.2d 695 (1975); *McElroy, supra,* a sudden blocking of the road, the sudden swerving of another vehicle or blinding lights, *Unangst, supra,* deer standing in the roadway, *Chadwick, supra,* and, even brake failure, *Gilligan v. Shaw,* 441 Pa. 305, 272 A.2d 462 (1971).

 However, the unforeseen movement of an object or the sudden apparition of an obstruction on the roadway

voked have not implicated any moving instrumentality suddenly thrust out in front of the actor. For example, in *Lehner, infra in text,* and *Palmer, infra in text,* two passengers hurled themselves out of a runaway streetcar to avoid what they believed to be imminent injury or death. In *Stebner, infra in text,* the actor suffered severe injury to his hand which he cast through a glass door in attempting to escape uncontrollable, inferno-like conditions in a steam room. And in *Carpenter, supra,* the sudden emergency there invoked was the perceived necessity of the decedent to climb atop a train car to retrieve his clothing which his assailant had flung there and where the decedent was then electrocuted. The court rejected the doctrine not due to the absence of a moving object suddenly flung in front of the actor but, rather, because of the lack of any exigency to retrieve his clothing. We rest our decision here not to find a sudden emergency on the doctrine's broader application. Hence, the fact that the Evans car never suddenly veered in front of the Linden vehicle bears no relevance to our refusal to find a sudden emergency in this case.

do not perforce trigger the applicability of the doctrine.[5]
*Randolph, supra* (improper to charge jury on sudden emergency due to blinding lights from another vehicle when driver of first vehicle did not reduce his speed upon confronting the lights; any emergency created was his own); *Schiele v. Motor Freight Express, Inc.*, 348 Pa. 525, 36 A.2d 467 (1944) (driver cannot invoke sudden emergency rule due to fog when truck driver collides with another truck where former was driving too fast for conditions); *Westerman v. Stout,* 232 Pa.Super. 195, 335 A.2d 741 (1975) (improper braking while driving through fog does not give rise to protection of sudden emergency doctrine); *Papandrea, supra* (brake failure is unforeseen occurrence, but no evidence other than defendant's own testimony to show failure actually occurred negates applicability of the doctrine); *Chiodo, supra* (unforeseen defective braking not within contemplation of the doctrine); *Hartman, supra* (jury instruction that brake failure is *per se* sudden emergency erroneous); *Elder, supra* (inoperable tail lights is not object darting out in front of vehicle to rear; therefore, instruction on sudden emergency is erroneous); *Hanlon, supra* (deer not actually

---

**5.** In vehicle collision cases, an instruction on the sudden emergency doctrine may be given concurrently with one on the assured clear distance ahead rule if the facts do not conclusively establish the existence of a sudden emergency. *Potenburg, supra. Accord Papandrea, supra; Elder, supra; Ernst, supra.* Otherwise, the two are mutually exclusive doctrines and, in the absence of any evidence indicating a sudden emergency, it is improper to charge on both doctrines. *Papandrea, supra; Elder, supra.* The assured clear distance ahead rule applies to static objects, including vehicles moving in the same direction; whereas, the sudden emergency doctrine implicates a moving instrumentality unexpectedly thrust into the driver's lane of travel. *Papandrea, supra; Elder, supra; Potenburg, supra; Brown, supra, Unangst, supra.* Thus where a driver is confronted with an object which unexpectedly appears within his clear assured distance, the assured clear distance rule is negated by the applicability of the sudden emergency doctrine, since the driver has already mentally cleared that distance, and no further duty is imposed. *Brown, supra; Unangst, supra.* The assured clear distance ahead rule appears as part of the Motor Vehicle Code and is codified at Section 3361, 75 Pa.C.S.A. § 3361. As none of the parties has raised any issue regarding the applicability of the distance rule and its relationship to the emergency doctrine, we only make a passing comment in this regard for the purpose of clarification.

on road but merely approaching it is not sudden emergency); *Hollern, supra* (dust cloud is not sudden emergency where driver became aware of it in time to reduce speed and brake on approaching it instead of keeping foot on accelerator); *Downey, supra* (vehicle approaching from opposite direction in same lane of travel was emergency of driver's own making where driver attempted to steer between that approaching vehicle and another speeding vehicle on his left when driver had option either to stop or to drive off to berm, thus obviating the emergency).

The doctrine has also found application in accident cases involving vehicles other than automobiles or trucks and on terrains other than roadways. *See e.g., Murphy v. Neely,* 319 Pa. 437, 179 A. 439 (1935) (the turning off of an airplane ignition during an unexpected, sudden nose dive was proper in light of the sudden emergency of the airplane dropping where the unexpected falling, not the turning off of the ignition, was the legal cause of the accident); *Johnson v. Pennsylvania R.R. Co.,* 399 Pa. 436, 160 A.2d 694 (1960) (physical impediments precluding clear view of tracks and the failure of the locomotive engineer to whistle the impending approach of the train created peril for driver and passenger of a motor vehicle unable to cross over or to back up off the tracks in less than three seconds when train was only one-hundred fifty to two hundred feet away, traveling at least forty miles per hour); *Broad v. Pennsylvania R.R. Co.,* 357 Pa. 478, 55 A.2d 359 (1947) (stalled truck on railroad tracks is sudden emergency where train could have stopped in time to avoid striking truck).

A pedestrian also may seek the protective umbrella of the rule. *See, e.g., Bauer v. Sacks,* 355 Pa. 488, 50 A.2d 351 (1947) (pedestrian in the middle of the street within the crosswalk who begins to run when faced with rapidly approaching automobile towards other side of street to avoid being struck was faced with a sudden emergency when he continued to run); *Maselli v. Stephens,* 331 Pa. 491, 200 A. 590 (1938) (same); *West v. Morgan,* 345 Pa. 61, 27 A.2d 46 (1942) (State-employed laborer working on road tearing up

streetcar rails was faced with sudden emergency when trailer-truck speeding towards a parked State-owned truck suddenly veered toward him as he attempted to run for safety towards the curb); *Hall v. Robert Hawthorne Co.,* 161 Pa.Super. 470, 55 A.2d 557 (1947) (sudden emergency occurred when pedestrian on sidewalk flattened himself against a building to avoid being caught and squeezed between building and truck bed protruding onto sidewalk as truck drove on street; this required quick, reflexive action on his part in light of the circumstances, even though the jury could have found that he could have ran ahead of truck or gone into a doorway for safety). *Cf. Forsythe v. Wohlfarth,* 205 Pa.Super. 416, 209 A.2d 868 (1965) (driver who strikes pedestrian crossing the street within crosswalk at intersection cannot claim defense of the rule on the basis that the driver did not see the pedestrian until the impact when he should have been aware of the pedestrian crossing the street before impact).

▮ Passengers, no less than pedestrians, are also covered by the rule, even though application of the doctrine in some cases seems to negate the aforementioned "dart out" theory, i.e., a moving instrumentality suddenly thrusting out into the operator's path of travel. *See Chiodo, supra; Papandrea, supra; Elder, supra; Sagan, supra; Carpenter, supra.* A passenger who is confronted with the impending peril of a collision which would otherwise culminate in death or serious injury may rescue him/herself from imminent disaster on the basis of a sudden emergency. *See Lehner v. Pittsburgh Rys. Co.,* 223 Pa. 208, 72 A. 525 (1909) (passenger who leaps from a streetcar as it plunges backwards down a steep and winding track to avoid approaching danger and is injured in the course of jumping from the car was faced with sudden emergency from which she attempted to save herself); *Palmer v. Warren Street Ry. Co.,* 206 Pa. 574, 56 A. 49 (1903) (same); *DeGregorio v. Malloy,* 356 Pa. 511, 52 A.2d 195 (1947) (police officer on the running board of a truck containing an ill passenger was directing traffic to take the ill passenger to the hospital when the truck on which he was standing struck a parked truck in

attempting to pass another truck and overturned; the sudden emergency rule applied because plaintiff was attempting, in his role as police officer, to get the ill person to the hospital and could not otherwise direct the truck through heavy traffic).

Research has disclosed three cases which do not involve vehicle accidents and in which our courts have addressed the applicability or not of the sudden emergency doctrine. In *Noll, supra,* the trial court granted judgment notwithstanding the verdict in favor of appellee/defendant bank which invoked the rule on the basis that one of its tellers, during the course of a bank robbery, disregarded an order from one of the robbers to everyone in the bank at that time not to move. The teller, eight to ten seconds after the order was issued, and in disregard thereof, dropped behind the counter. The robbers saw this action and immediately fired three shots in the teller's direction. One of the bullets lodged in the hip of appellant/plaintiff-customer upon whom the teller had been waiting. Appellant charged negligence on the part of the teller in failing to obey the robber's order and argued that the teller and the bank should have realized that the robbers would shoot if their directives were not followed and that appellant would be likely to be in danger. The Supreme Court disagreed, holding that the proximate cause of appellant's injury was the result of an independent action of third persons (the robbers) in issuing their unlawful directive not to move, not the teller's disregard of that illegal order. In applying the sudden emergency rule to the teller's action, the Supreme Court reasoned:

> In this very brief interval he had to determine what his conduct should be. It was obvious that his life was in jeopardy. His act in dropping to the floor was one of self-defense only. Whether he was prompted by reason or instinct no one can say. The exigency could not have been greater, and he cannot be held to perfect judgment under the circumstances.

347 Pa. at 215, 32 A.2d at 19.

In *Stebner v. YMCA,* 428 Pa. 370, 238 A.2d 19 (1968), the Supreme Court, in reversing the grant of a non-suit in favor

of appellee/defendants, the "Y" and the builder of the steam room on the premises, once again recognized the existence of a sudden emergency when appellant/plaintiff, a member-invitee of the "Y", injured himself in attempting to escape from the steam room when the lock on the door of that room refused to turn. The steam could not be regulated and, when appellant attempted to turn the knob of the door as soon as he entered the room, the bolt would not move. Appellant began to pound on the glass panel of the door to attract someone's attention, in the process of which his hand went through the glass, and he was severely cut. When people finally came to the other side of the door to attempt to unlock it, he screamed for someone to knock the glass out so that he could crawl through the door. The Court rejected the contention of appellee "Y" that it could escape liability for appellant's injury on the basis of lack of proximate cause "merely because the victim, in fright, frenzy or panic adds to his danger by an act which, in a later serene moment of contemplation, might seem to have been unwise." 428 Pa. at 374, 238 A.2d at 21. Instead, Justice Musmanno, writing for the majority, opined:

Under the circumstances surrounding Stebner, with the fumes of the steam assailing him and the door refusing to yield to the desperate efforts of himself and others, the Court was not justified in declaring as a matter of law that Stebner could not have entertained a well-grounded belief that it was necessary for him to escape from the steam room as rapidly as possible to save himself from serious harm, and to attempt to summon rescue by banging on the door when vocal calls failed to bring response.

428 Pa. at 375–76, 238 A.2d at 22.

More recently, this court, in *Carpenter, supra,* refused to find the existence of sudden emergency relative to the decedent's action, the result of which was that he was electrocuted atop one of appellant/defendant's train cars at one of its non-operating stations. The decedent's presence at the deserted train station could not be explained—i.e., whether he was there voluntarily as a trespasser or was

brought there involuntarily. Decedent, according to his statement given before death, was robbed and stabbed. His assailant forced decedent to disrobe, except for the latter's socks and undershirt. The assailant then threw the clothing atop the car on which the decedent was later found electrocuted. After the assailant had fled, the decedent climbed to the top of the train car in an attempt to retrieve his clothing. He stated that the car was dark and abandoned but, in fact, and unfortunately for the decedent, eleven thousand volts of electricity flowed through the overhead lines to the car. He was electrocuted when he contacted the pantograph, the metal structure on top of the car which transferred the voltage from the lines to the car. The decedent's representative, appellee, argued that decedent was in the midst of a sudden emergency which necessitated his climbing to the top of the train car to retrieve his clothing which the assailant had thrown there. In response, appellant railroad argued:

Appellant claims, however, that as a matter of law, the emergency had terminated, and the court erred in charging the jury on the doctrine. Essentially, appellant argues that the only emergency was the actual robbery and stabbing of the decedent, and that once the assailant fled, the emergency was at an end. Implicit within this argument is a claim that the decedent's position of being in a railroad station clad only in his socks and undershirt was not such an emergency as to entitle appellee to the charge.

269 Pa.Super. at 16, 409 A.2d at 40.

This court, expressing agreement, reasoned:

Instantly, we do not deem the decedent's status as one permitting a charge as to the sudden emergency doctrine. As noted in appellant's brief and in the dissenting opinion in the court below, the sudden emergency of the robbery, stabbing and the decedent's forced removal of his clothes had run its course once the assailant fled, and the action of the decedent in climbing to the top of the train car to retrieve his clothes was not part of that emergency

situation. Indeed, his action in attempting to recover his clothes rather than seek aid for his wound may itself evidence a conscious and deliberate action rather than a reflexive and unconscious re-action to the situation. Nor do we believe that the decedent's unclad state would, in the situation here presented, constitute an emergency. Because the area of the station in which the robbery took place was not in use and the decedent was not immediately exposed to others, we must conclude that his situation was not one requiring a '[s]hortage of time for decision, and circumstances which would perturb or upset the judgment of the ordinary reasonable man....' Restatement § 296, Appendix, Reporter's Notes. Comment a. Therefore, the lower court erred in charging on this doctrine.

269 Pa.Superior Ct. at 16–17, 409 A.2d at 40–41; footnote omitted.

 The emergency claimed instantly is not the motor vehicle accident which has been the subject of this litigation but is, rather, Linden's purported sudden dilemma which arose when he and Arlene saw Evans drive up the street in his Jeep towards them as they were seated in Linden's parked car outside the residence of Arlene's parents where the latter also resided. This resulted in the ensuing ten-to-fifteen minute, ten-mile chase which culminated in the subject motor vehicle accident. Linden testified at trial that his car was parked immediately in front of the dwelling where Arlene resided and that she was going to get out of his car just as she saw Evans coming up the street in his Jeep. After informing Linden that the driver of the Jeep was her former boyfriend, Arlene immediately told him to "get out of there." N.T. 786. After Arlene told Linden to move, he started the car, hoping that Evans would leave the two alone. However, Evans began to follow Linden and at one point refused to permit the former to make a left turn.

During this chase, Evans was bumping the back of Linden's car and, alternately, flicking his high beams on and off. Linden testified that he was "very scared." "Because

he [Evans] was hitting the back of my [Linden's] car, I didn't know if he was going to push my car off the road or anything else." N.T. 788. Linden also refused to let Evans pass him because the former was afraid of a rear-end collision and was also afraid of a physical confrontation with Evans whom Linden felt was capable of inflicting injury upon him.

Linden passed a police station during this ten-mile course but did not stop because he feared that Evans would hit him or his car. His fear increased with the length of his journey, as did the speed of his vehicle. He testified several times that he was afraid of physical harm from Evans which might result in a broken nose or losing a few teeth. N.T. 815. Linden further stated that he would have kept on going as long as Evans had or until, as Linden had hoped, a police officer would have stopped him.

Underpinning each of the cases in which we have analyzed the applicability or not of the sudden emergency doctrine is the necessity of making a split-second decision because of an impending exigency. It is clear that even the non-motor vehicle cases, i.e., *Stebner* and *Noll,* provide no assistance to Linden. The parties who invoked the protection of the doctrine there were faced with life-threatening situations (Stebner, with suffocation, and the bank teller in *Noll* with the real possibility of getting shot), the need to take immediate action and the lack of sufficient time within which to prudently assess the exigency. In contrast, the exchange between Linden and counsel for Margaret reveals the following with respect to Linden's alleged peril:

Q. Now, let's talk about the choices that you had. You could have asked Arlene to get out of the car and go in the house, couldn't you?

A. *I could have, yes.*

Q. You could have said or thought at that point Arlene go ahead into the house, Mike Evans would have possibly gone in to confront her and you would go home? That was a possibility, wasn't it?

A. *Sitting here today thinking about it, yes. There is a lot of possibilities.*

Q. You had that choice and you had the choice of stopping at the fire station that we all heard about, didn't you? It was a choice?

A. *Yes.*

Q. And you had the choice of stopping at the police station. That was a choice, too, wasn't it?

A. *In a way, yes, sir.*

Q. And you also had the choice of stopping your car; is that correct?

A. *Yes.*

Q. And locking the doors; is that correct?

A. *Yes, sir.*

Q. Now, if Mr. Evans confronted you at that point, got out of his Jeep and he was on foot and walked up to your car, you had your car running and the doors locked, could you have stepped on the gas then and pulled away?

A. *Yes, sir.*

Q. He would have been standing in the street?

A. *Yes.*

Q. Now, I think you testified that it was your intention not to let him pass you?

A. *Yes.*

Q. And he did cut you off at one point; is that correct?

A. Yes.

Q. *When he cut you off were you completely stopped then?*

A. *I did stop, yes.*

Q. And did you have to back up at all?

A. No.

Q. You just went around his vehicle?

A. His vehicle went around my left side and skidded across the street.

Q. So you just turned your wheel and pulled out again?

A. Made a left turn.

Q. *But it was your distinct intention not to let him pass you; is that correct?*

A. *Yes.*

N.T. 815–817; emphasis supplied.

We have stated that an actor facing a sudden emergency, as defined by our courts, will not be responsible to the same degree as one confronted with what might be judged under the circumstances then prevailing as normal and foreseeable for any mistake of judgment in delivering himself from the exigency. *See, e.g., Noll, supra; Moore, supra; Carpenter, supra.*

We cannot say, based on the record before us, however, that this ten-mile, ten-to-fifteen minute pursuit through the West End of the City of Pittsburgh constituted a sudden emergency. As the record indicates, Linden had several options available and had time in his favor within which to exercise any one in a rational, conscious manner, beginning with what we consider to be the most obvious and immediate choice—alighting from his vehicle into the safe confines of the residence of Arlene's parents, especially when Evans had, upon seeing the couple, remained in the Jeep.

We find our decision in *Carpenter* to be controlling here, for we would be remiss in concluding that Linden's action in this regard was the product of unconscious reflex. Instead, it evidenced a conscious and deliberate act. *Carpenter, supra.* Nor does Linden's situation compel us to find a " '[s]hortage of time for decision, and circumstances which would perturb or upset the judgment of the ordinary reasonable man....' " *Id.*, 269 Pa.Superior Ct. at 17, 409 A.2d at 41. Neither the existence of an immediate harbor of safety nor a ten-minute, ten-to-fifteen mile pursuit contemplate the application of this doctrine under the jurisprudence prevailing in this Commonwealth. We do not perceive the existence of any exigency which, under the facts of this case, would call for a jury instruction on the sudden emergency doctrine. It was error for the trial court to so charge the jury. Our analysis of the case law in this Commonwealth leads us to the unqualified conclusion that

the sudden emergency doctrine simply has no applicability to the case at bar. Indeed, any emergency which may have arisen was of Linden's own creation, which, upon judicious reflection, simply would have failed to materialize. Moreover, by virtue of his subsequent irrational behavior, Linden effectively abandoned whatever protection the rule may have afforded him when he chose to leave the relatively safe environment of his parked automobile and the close proximity of Arlene's home. *See Carpenter, supra.* Linden should not be permitted to reap the benefit of his own folly and is therefore not entitled to a jury charge in that regard.

A representative sampling of sister state jurisdictions indicates that Pennsylvania's application of the sudden emergency doctrine is not a jurisprudential anomaly. *See, e.g., Illey v. Hatley*, 693 S.W.2d 506, 510 (Tex.Ct.App.1985) (motor vehicle case; "Sudden emergency is a condition arising suddenly and unexpectedly and not proximately caused by any negligent act or omission of the person in question and which calls for immediate action on his part and without time for deliberation. A sudden emergency would relieve a party from the consequences of his conduct."); *Maloney v. Kaminski*, 220 Neb. 55, 66–67, 368 N.W.2d 447, 457 (1985) (motor vehicle case; rule can be invoked when the emergency is sudden and not of the actor's own creation, alternative courses of action to choose exist and the need to make a split-second decision is evident; action taken, which upon more mature reflection, was erroneous; "The sudden emergency doctrine is to be submitted to the jury where there is evidence that a wrong course of action was pursued, from the results of which the actor is to be excused because of the stress and shortness of time under which the decision was made."); *Heidbreder v. Northampton Twp. Trustees*, 64 Ohio App.2d 95, 411 N.E.2d 825 (1979) (police officer believed robber shot at him from get-away car and fired back at car intending to hit driver; instead, the bullet ricochetted off the get-away car and struck a three-year old child; sudden emergency question is for jury if police officer had time for reflection and

should be ableto anticipate and handle extraordinary situations). Additionally, three sister jurisdictions have either abandoned completely or have abolished the use of jury instructions on the doctrine in motor vehicle cases. *See Knapp v. Stanford,* 392 So.2d 196 (Miss.1980) (complete abolition) and *Note,* 51 Miss.L.J. 301 (1980); *Simonson v. White,* —— Mont. ——, 713 P.2d 983 (1986) (abandonment in motor vehicle cases); *DiCenzo v. Izawa,* —— Haw. ——, 723 P.2d 171 (1986) (same; potential for prejudicial error in jury instructions).

Our interpretation of the sudden emergency rule is also no less consistent with that of two notable commentators on that subject.

An emergency has been defined as a sudden or unexpected event or combination of circumstances which calls for immediate action; and although there are courts which have laid stress upon the 'instinctive action' which usually accompanies such a situation, it seems clear that the basis of the special rule is merely that the actor is left no time for adequate thought, or is reasonably so disturbed or excited that the actor cannot weigh alternative courses of action, and must make a speedy decision, based very largely upon impulse or guess.

. . . . .

The 'emergency doctrine' is applied only where the situation which arises is sudden and unexpected, and such as to deprive the actor of reasonable opportunity for deliberation and considered decision. Furthermore, it obviously cannot serve to excuse the actor when the emergency has been created through the actor's own negligence, since he cannot be permitted to shield himself behind a situation resulting from his own fault.

W. Prosser and W.P. Keeton, The Law of Torts, 196, 197 (5th ed. 1984); footnotes omitted. However, these commentators also caution that "[d]espite the basic logic and simplicity of the sudden emergency doctrine, it is all too frequently misapplied on the facts or misstated in jury instructions." *Id.* at 197; footnote omitted.

We believe that this is no less true here. The jury, in answer to Interrogatory No. 3, found that Linden was negligent; however, in response to Interrogatory No. 4, that deliberating body did not also find Linden's negligence to be substantial factor in causing the subject accident. We would be reluctant to conclude that the trial judge's charge to the jury on the sudden emergency doctrine did not affect the ultimate verdicts upon which this appeal is premised. Consequently, we vacate all the judgments entered on the verdicts in the trial court. We also vacate the order granting a new trial on damages. Instead, we remand this matter to the trial court for a new trial on both liability and damages as to all parties.[6]

### III.

Lastly, we address the propriety of admitting the testimony concerning Trecki's alcohol consumption prior to the accident in question.

The motion *in limine* was presented by counsel for Trecki and counsel for appellants to preclude any testimony regarding the alcohol consumption of Trecki. Relying on *Morreale v. Prince*, 436 Pa. 51, 258 A.2d 508 (1969), appellants correctly argue that evidence of drinking without evidence of intoxication is inadmissible. They claim that they were prejudiced by this testimony because they had attended the same party as Trecki and were passengers in his car. They also claim that it adversely affected their case against Linden.

As part of the case on liability, counsel for Linden read the following deposition testimony of Trecki into the record during the trial:

Q. After you arrived at the party did you have anything to drink?

A. Yes.

Q. What were you drinking?

A. Beer.

6. See note 1, *supra.*

Q. How much did you have?

A. About five, six, seven glasses of beer or more.

Q. What size glasses are we talking about?

A. Twelve ounce.

Q. In your opinion were you intoxicated?

A. No, well with the new thing today, with breath test and stuff, I probably would have been.

Q. You think you would have been more than one point?

A. Probably. But to my knowledge, I wasn't.

Q. No, over what period of time did you drink this beer?

A. From 11:00 until 1:30, two o'clock.

N.T. 266–67.

Since *Critzer v. Donovan*, 289 Pa. 381, 137 A. 665 (1927), it has been the rule in this Commonwealth that when recklessness or carelessness is at issue, proof of intoxication is relevant, but the mere fact of consuming alcohol is not admissible as being unfairly prejudicial unless it reasonably establishes intoxication. *Cusatis v. Reichert*, 267 Pa. Super. 247, 249–250, 406 A.2d 787, 788–89 (1979) (collecting cases).

In the case before us, Trecki, himself, admitted that he was "probably" intoxicated, that he had consumed seven or more twelve-ounce glasses of beer at a party within a three-hour period immediately prior to the accident and that his blood alcohol level was "probably" more than .10%. In our view, these statements, alone, are sufficient evidence of intoxication to introduce the questioned deposition testimony. We therefore conclude, as did counsel for both Evans and Linden in their appellate briefs, that the trial court did not commit error in permitting the above-quoted testimony.

Judgments entered on all verdicts are reversed and vacated; order granting a new trial on damages is also reversed

and vacated. Matter is remanded for a new trial on both liability and damages. Jurisdiction is not retained.[7]

BECK, J., files a concurring opinion.

WIEAND, J., files a concurring statement in which OLSZEWSKI, J., joins.

TAMILIA, J., concurs in the result.

BECK, Judge, concurring:

I concur in the result reached by the majority that Officer Valone's testimony was properly admissible as evidence of the point of impact of the accident.

I also agree with the majority that the sudden emergency doctrine has no applicability to the facts of this case. Moreover, I find the sudden emergency doctrine serves more to confuse than enlighten a jury.

The doctrine recognizes that a person, usually a defendant, who finds him or herself in a perilous situation, cannot be expected to exercise the degree of care of a reasonable person acting under normal circumstances. The reason for the special jury instructions is the recognition that the reasonable person who had an opportunity to reflect before he or she acted might have acted differently. *E.g. Chiodo v. Gargloff & Downham Trucking Co.*, 308 Pa.Super. 498, 454 A.2d 645 (1983).

Initially, I am critical of the doctrine because it is unnecessary. Traditional rules of tort law already provide a satisfactory foundation for analyzing questions raised by circumstances of sudden emergency[1], and the special instructions given by the judge to the jury obfuscate rather than clarify the task of the jury. In a traditional negligence analysis, after the jury determines that a sudden emergency exists, the jury then decides whether the defendant acted

---

7. In light of our disposition above, we consider it unnecessary to reach appellants' remaining argument which concerns the inadequacy of the damage awards to Margaret, Colleen and Ricky.

1. *See* Gunn, *The Sudden Emergency Doctrine is Abolished in Mississippi*, 51 Miss.L.J. 301 (1980).

as a reasonable person under the emergency conditions. In other words, in order to avoid liability for negligence, the defendant must conduct him or herself as a reasonable person under the emergency circumstances. If the defendant acts unreasonably under the emergency conditions, he or she may be liable.

Case law, on the other hand, including the majority's opinion in the instant case, has miscast the sudden emergency doctrine as a defense which will render a defendant "not ... responsible for any mistake of judgment in extricating himself from the impending dangerous situation." Opinion at 273. On the contrary, as is noted in PROSSER AND KEETON ON TORTS, § 33 at 196–97 (5th ed. 1984), the doctrine does not provide a complete defense because "[t]he conduct required [by the defendant] is still that of a reasonable person under the [emergency] circumstances ..., and the emergency is to be considered only as one of the circumstances." *Id.*

Another element of confusion is whether the circumstances of a particular case require the invocation of the doctrine. The instant case is one example of an improper invocation of the doctrine, and the majority opinion is replete with examples of other cases where the doctrine was mistakenly applied by the trial court.

Furthermore, the sudden emergency doctrine provides a disproportionate advantage for defendants because it in a sense imposes on a plaintiff a higher burden of proving negligence than exists in an ordinary case. It unduly focuses the jury's attention on the circumstances in which the defendant acted, instead of encouraging the jury to assess the defendant's conduct objectively, albeit with due regard for all of the attendant circumstances. *See* Gunn, *supra* (citing *Knapp v. Stanford,* 392 So.2d 196 (Miss. 1980)). This is true whether or not the doctrine is viewed as a complete defense that arises whenever a sudden emergency exists. If the jury views the sudden emergency doctrine as a total defense, then the mere invocation of the doctrine is sufficient to insulate the defendant from liability. On the

other hand, even if the jury does not view the doctrine as a total defense, it is still more likely than not that the jury will respond to the judge's instruction on sudden emergency by concluding that a defendant's "instinctive" reaction was not negligent.

The bias in favor of the defendant is clear. Take, for example, a situation in which a large boulder suddenly falls from a hill abutting the road. This would create a sudden emergency. In this scenario, the driver must quickly choose to swerve to the right onto a lower part of the hill (and perhaps endanger himself) or must quickly choose to swerve to the left onto incoming traffic. If he chooses the latter course, and injures a party in an on-coming car, the sudden emergency instruction gives greater legitimacy to the defendant's action than it may deserve. It impedes the jury from making the proper inquiry, i.e. what would a reasonable person have done under the emergency circumstances. The jury is likely to assume that the sudden emergency alone insulates the defendant from liability. I can posit no policy ground for thus advantaging the defendant, who made a choice, over the injured plaintiff in the on-coming car, who was not negligent and was injured.

Thus, although in the case sub judice I agree with the majority that the sudden emergency doctrine was inapplicable, I would add that my concerns with the doctrine as a whole lead me to conclude that it should be eliminated altogether.

WIEAND, Judge, concurring:

I concur in the decision of the majority to award a new trial. In my judgment, the trial court's jury instruction on the sudden emergency doctrine was unnecessary and unwarranted. It would have been adequate to instruct the jury to determine whether Linden had exercised reasonable care in view of the circumstances with which he was confronted. I would also hold that it was error to permit Officer Vallone to express an opinion regarding the location of the impact when, as Officer Vallone conceded, her opin-

ion was based in part upon the extra-judicial statements of witnesses at the scene of the accident.

OLSZEWSKI, J., joins.